# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3016 | **DATE** | 10/9/2002 |
| **CASE TITLE** | AXA Corporate Solutions vs. Underwriters Reinsurance Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion to dismiss [7-1] is granted. Case dismissed. Status hearing of 10/10/02 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

| MD | courtroom deputy's initials | | | |
|---|---|---|---|---|

OCT 10 2002

date docketed

docketing deputy initials

10/9/2002
date mailed notice

MD
mailing deputy initials

Document Number

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AXA CORPORATE SOLUTIONS, formerly    )
known as AXA REASSURANCES S.A.,    )
   )
       Plaintiff,    )
   )
       vs.    )    **No. 02 C 3016**
   )    **Judge Joan H. Lefkow**
UNDERWRITERS REINSURANCE    )
COMPANY,    )
   )
       Defendant.    )
   )

**DOCKETED**

OCT 1 0 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff, AXA Corporate Solutions, formerly known as AXA Reassurances S.A. (either

or both, "AXA"), brings this lawsuit against Underwriters Reinsurance Company ("URC")

seeking rescission of a reinsurance agreement and a declaratory judgment that URC is obligated

for any resulting damages AXA must pay to URC's insured, Chase Manhattan Bank ("Chase"),

as a result of URC's breach of a duty of utmost good faith towards its insurer as well as breach of

certain warranties with respect to the agreement between AXA and URC. AXA also claims

damages for breach of a related agreement in which URC agreed to move the filing of the

insurance documents from one state to another. AXA is a French corporation with its principal

place of business in Paris, France. URC is a New Hampshire corporation with its principal place

of business in Calabasas, California. The amount in controversy exceeds $75,000. The court,

therefore, has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332(a)(2) (diversity).

Before the court is URC's motion to stay or dismiss the case pursuant to Federal Rule of Civil

Procedure 12(b)(6) based on the *Colorado River* doctrine and/or Illinois statute, 735 ILCS 5/2-

619(a)(3). For the reasons set forth below, the court grants the motion to dismiss.

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *General Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no facts in support of its claim that would entitle it to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957); *Kennedy* v. *Nat'l Juvenile Det. Assoc.*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in the plaintiff's favor. *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002); *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999).

## ALLEGATIONS OF THE COMPLAINT

According to AXA's Complaint, which is taken as true for the purpose of the motion, this action arose out of a number of intertwined agreements, including (1) a Cash Flow Insurance Policy issued by URC in favor of Chase under which URC agreed to insure Chase for shortfalls in the repayment of a loan to George Litto Pictures, Inc. ("GLP"); (2) reinsurance "slips" binding AXA to reinsure URC for a portion of its obligations arising out of the Cash Flow Insurance Policy; (3) a Loss Payee Endorsement which provided Chase the right to deal directly with AXA in matters related to the Cash Flow Insurance Policy as though AXA were a named insurer under that policy; and (4) an agreement by which URC represented that it would file the policy documents with the Illinois Department of Insurance ("Illinois DOI"). (Compl. ¶ 1.)

Since the early 1990s, Chase has been an industry leader in motion picture financing.

2

(Compl. ¶ 11.) While initially Chase structured its loans so that it alone accepted the credit risk[1] of a film production, beginning in 1994 Chase created insurance-backed film financing programs whereby Chase provided loans to borrowers whose collateral was based on the business risk of the film's success. (Compl. ¶¶ 11-12.) Chase would secure these loans through film insurance revenue policies. (Compl. ¶ 12.) Under these policies, the insurer agreed to accept the risk that the revenues generated by the insured film production would be insufficient to repay any or all of the Chase loan. (Id.) Thus, Chase could turn to the insurer for any shortfall in the repayment of its loan to the borrower. (Id.)

The particular film financing program that this case centers on involved a loan to GLP. This loan was organized by Sawtantar Sharma ("Sharma"), an insurance broker employed by Stirling Cooke Brown Reinsurance Brokers Ltd. ("SCB") (Compl. ¶ 13.) The initial proposal was for a five picture, $100 million "Master Facility." (Id.)

In early 1997, AXA indicated a willingness to participate as a reinsurer for the five-picture Master Facility. (Compl. ¶ 16.) In August 1997, URC was presented with the opportunity to act as the insurer for the transaction. (Compl. ¶ 18.) As part of the proposed GLP transaction, Chase and URC insisted that the reinsurers each sign a Loss Payee Endorsement or "cut-through" agreement in Chase's favor. (Compl. ¶ 22.)

During and prior to 1998, AXA informed URC that AXA wanted the insurance, reinsurance and cut-through agreements to provide that New York law would govern and that any dispute over the contracts would be settled in New York courts. (Compl. ¶ 23.) URC

---

[1]The credit risk was the risk that the debtor's collateral would not have sufficient value to fully repay the loan. (Compl. ¶ 11.)

subsequently learned, however, that it could not issue the insurance in New York because it did not hold the required licenses. (Compl. ¶ 24.) URC then proposed issuing the policy in Texas, with the inclusion of a provision providing for New York law and jurisdiction. (Compl. ¶ 25.) In October 1998, the Texas Department of Insurance ("Texas DOI") informed URC that it would not approve a policy that provided for New York law and jurisdiction. (Compl. ¶ 26.) URC did not at this time inform AXA or any other reinsurer involved with the proposed GLP transaction that the Texas DOI would not accept New York law and jurisdiction. (*Id.*)

After a year passed and GLP did not come forward with any film, and, as a result, the Master Facility policy was never executed, Chase agreed in April 1999 to provide GLP with funding for two motion pictures, "The Crew" and "Standing Room Only." Sharma asked AXA to move forward with reinsuring a two-picture deal, which would later be rolled into the five-picture Master Facility the parties had originally intended. (Compl. ¶ 32.) URC submitted to the Texas DOI for approval a two-picture Cash Flow Insurance Policy and Loss Payee Endorsement providing for New York law and jurisdiction. (Compl. ¶ 50.) The Texas DOI would not approve the filings with New York law and jurisdiction, so URC, without informing AXA, filed a revised version with the Texas DOI that contained a forum selection clause providing for jurisdiction in federal or state court in Texas and the application of Texas law. (Compl. ¶ 49-50.) The forum selection clause states, in pertinent part:

> The Insurer and each Lead Re Insurer hereby irrevocably submits itself to the jurisdiction of the state courts of the State of Texas in Harris County and to the jurisdiction of the United States District Court for the Southern District of Texas, for the purposes of any suit, action or other proceeding arising out of or based upon this policy or the subject matter hereof brought by the insured or any of its successors or assigns in either of the above-referenced forms at the sole option of the insured.

AXA did not learn of the change to Texas law and jurisdiction until late June or early July 1999. (Compl. ¶ 51.) On July 2, 1999, AXA informed Sharma that AXA would not accept a contract that provided for Texas law and jurisdiction. (Compl. ¶ 52.) On July 6, 1999, AXA reiterated its position in a telephone conference and threatened to pull out of the deal. (Compl. ¶ 53.) URC responded that because the insurers did not come "on risk" under the Cash Flow Insurance Policy until delivery of the first film, URC had about a year to move the state from which the Cash Flow Insurance Policy and Loss Payee Endorsement were issued. (Id.)

URC then contacted the Illinois DOI to determine whether it would allow URC to issue the Cash Flow Insurance Policy and the Loss Payee Endorsement in Illinois. (Compl. ¶ 54.) URC represented to AXA that the Illinois DOI would approve a policy calling for New York law and jurisdiction. (Id.) AXA informed URC on July 7, 1999 that it would go forward with the GLP transaction only if URC agreed, among other things, to promptly file the Cash Flow Insurance Policy and the Loss Payee Endorsement in Illinois and to use its best efforts to obtain approval of New York law and jurisdiction, or, if the Illinois DOI would not accept New York law, then Illinois law and jurisdiction. (Compl. ¶ 58.)

URC accepted AXA's offer, first orally and then in writing. A July 7, 1999, letter from Kathryn Lessman ("Lessman"), then Branch Manager for the URC's Western Region stated:

> To confirm our telephone conversation today, please be advised that Underwriters Reinsurance Company (URC) will file the Form of Cash Flow Insurance Policy, the Master Policy of Cash Flow Insurance, and the Loss Payee (Cut Through) Endorsement (with amendments requested by you today during our teleconference) for review and approval with the Illinois Department of Insurance as soon as practicable. The policy and endorsement wording that URC will file with the Illinois Department of Insurance (DOI) will designate New York as the choice of law and jurisdiction governing the terms of the contract. If the Illinois DOI will not approve New York as the choice of law and jurisdiction, then the

5

policy and endorsement will be amended to designate Illinois law and court instead.

(Compl. ¶ 60.) Based on these representations, AXA approved two forms of Loss Payee Endorsement. (Compl. ¶ 63.) The first form of Loss Payee Endorsement was approved "amended as agreed." (*Id.*) AXA also approved a form that had been prepared by Chase, which contained the amended forum selection clause and other terms on which AXA had insisted.

On July 8, 1999, Lessman informed Sharma that URC would no longer agree to amend the Loss Payee Endorsement as AXA requested, but rather URC would accept only a specified form of Loss Payee Endorsement that did not contain the wording AXA had approved. Chase and URC then entered into a separate "side-agreement" whereby URC's obligation to insure a two-picture $89 million loan was amended to an obligation to insure financing for only one film, "The Crew," which was budgeted at approximately $21 million. (Compl. ¶ 69.) URC also insisted that Chase waive claims for punitive damages against URC, and that Chase not sue URC without naming the reinsurers as parties. (*Id.*) URC further advised Chase that the language of the reinsurance agreements would need to be amended such that the reinsurers, including AXA, would be obligated to indemnify URC for any damages in excess of policy limits and for punitive damages that may be imposed on URC. (Compl. ¶ 70.) Chase agreed to these changes. (Compl. ¶ 71.)

Due to this "side-agreement" URC failed to honor its July 7 agreement with AXA in regard to the reinsurance transaction, in that URC demanded that AXA agree to the Chase-URC alterations which also altered the AXA-URC reinsurance agreement. (Compl. ¶ 76.) When AXA refused to accept URC's changes, URC elected not to make the required Illinois DOI

filings. (Compl. ¶ 78.) Thus, the Texas law and jurisdiction provisions in the Cash Flow

Insurance Policy and Loss Payee Endorsement were never amended to New York or Illinois law

as URC had agreed. Thereafter, Chase made a claim against URC and AXA under the insurance

agreements.

Currently, three lawsuits are pending relating to the Cash Flow Insurance Policy. In

October 1999, AXA sued Chase and SCB in the Supreme Court for New York County, seeking a

declaratory judgment that AXA was not liable for any claim by Chase against it for losses under

the Cash Flow Insurance Policy.[2] Chase went on to institute an action against AXA in New York

to recover based on the Loss Payee Endorsement. The two cases were consolidated ("the New

York Action") so that all issues could be resolved in one trial. To AXA's disappointment, after a

jury trial, Chase obtained a declaration on its claim that AXA is obligated to Chase pursuant to

the Loss Payee Endorsement, a part of the Cash Flow Insurance Policy. The amount of the

obligation has not yet been determined and Chase has asked the court for leave to amend its

complaint to seek monetary damages against AXA. AXA intends to appeal.

AXA filed the instant suit against URC on April 26, 2002. On the same date, Chase sued

URC and all of the other reinsurers except AXA in Texas state court (the "Texas Action"). On

June 10, 2002, URC filed a third-party claim against AXA in the Texas Action alleging breach of

the reinsurance contract and seeking declaratory relief against AXA.

In the instant suit, in Count I, AXA seeks rescission of the reinsurance agreement based

on URC's breach of a duty of utmost good faith. According to AXA, URC owed AXA a duty of

---

[2]It appears that AXA asserted defenses that would have been available to URC had there been no cut through agreement. See Exhibit B to URC's Reply at 2.

7

utmost good faith by virtue of their reinsurance relationship which obligated URC to disclose to AXA all material facts pertaining to the original risk of loss under the Cash Flow Insurance Policy and that URC breached this duty by concealing and misrepresenting material facts.[3] AXA asks this court to declare that the reinsurance agreement is invalid or should be rescinded and that AXA has no obligation to URC thereunder. In Count II, AXA seeks a declaratory judgment that URC is obligated for any damages AXA must pay to Chase under any Loss Payee Endorsement Clause due to URC's breach of the utmost duty of good faith.

In Count III, AXA seeks rescission of the reinsurance agreement based on URC's breaches of warranty. AXA alleges that URC breached warranties as to the number of films that were to be covered by the insurance agreement, the amount and recipients of premium payments, and the filing of agreements with state insurance departments. AXA asks this court to enter judgment declaring that the reinsurance agreement is invalid or should be rescinded and that AXA has no obligation to URC. In Count IV, AXA seeks a declaratory judgment that URC is obligated for any damages AXA must pay to Chase under the Loss Payee Endorsement due to URC's breaches of warranty.

Finally, in Count V, AXA alleges breach of contract against URC. AXA contends that URC agreed both orally and in writing to file an amended Loss Payee Endorsement with the Illinois DOI to replace the prior Endorsement and file an amended Cash Flow Insurance Policy and Loss Payee Endorsement to provide for New York or Illinois law and jurisdiction. AXA

---

[3]The Complaint ¶ 90 lists six omissions of fact: that there would be one film, not two; that Chase would not seek punitive damages against URC; that URC did not intend to file with Texas DOI AXA's agreed-to amended Loss Payee Endorsement unless AXA agreed to new terms; that URC did not intend to file in Illinois unless AXA agreed to the new terms; that URC intended to be both insurer and insured by virtue of purchasing a participation in the Chase loan to GLP; and that Kemper Re had concerns about the transaction.

alleges that URC breached these contractual obligations, and as a result, URC is obligated to pay AXA an amount equal to AXA's obligations to Chase under the Loss Payee Endorsement.

## DISCUSSION

URC presents two arguments for stay or dismissal: (1) the *Colorado River* abstention doctrine applies[4] and counsels deference to the parallel Texas lawsuit, and (2) the case should be stayed or dismissed pursuant to 735 ILCS 5/2-619(a)(3) because the Texas lawsuit is another action pending between the same parties for the same cause.

### A.  *Colorado River* Abstention

In *Colorado River Water Conservation District* v. *United States*, 424 U.S. 800 (1976), the Supreme Court formulated an "exceptional circumstances" test whereby a district court may dismiss or stay an action when there is an ongoing parallel action in state court. *Id.* at 817-21. While recognizing the availability of judicial abstention in exceptional circumstances, the Court cautioned that district courts have a "virtually unflagging obligation to exercise jurisdiction given to them." *Id.* at 817-18. Moreover, the Seventh Circuit has recognized that a presumption exists against abstention. *Sverdrup Corp.* v. *Edwardsville Cmty. Unit School District No. 7*, 125 F.3d 546, 550-51 (7th Cir. 1997). Thus, simply because an action is pending in state court ordinarily is not a bar to parallel federal proceedings. *LaDuke* v. *Burlington N. R.R. Co.*, 879 F.2d 1556, 1558 (7th Cir. 1989), citing *Colorado River*, 424 U.S. at 817.

To determine whether the *Colorado River* abstention doctrine can be applied, the court

---

[4]The Seventh Circuit in *LaDuke* v. *Burlington N. R.R. Co.*, 879 F.2d 1556, 1562 (7th Cir. 1989) made it clear that the appropriate remedy in *Colorado River* abstention cases is a stay, not dismissal. *Id.* at ("Therefore, we affirm the principle that a stay is the proper procedural mechanism for a district court to employ when deferring to a parallel state court proceeding."). Thus, the court will only analyze URC's claims as to whether the case should be stayed under *Colorado River*, not dismissed.

must first decide "whether the concurrent state and federal actions are actually parallel." *Id.* If

the actions are parallel, the district court must next consider a number of non-exclusive factors

that might justify abstention, including: (1) whether the state has assumed jurisdiction over the

property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal

litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the

source of governing law, state or federal; (6) the adequacy of state-court action to protect the

federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the

presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the

vexatious or contrived nature of the federal claim. *Sverdrup*, 125 F.3d at 550; *LaDuke*, 879 F.3d

at 1559, citing *Lumen Constr., Inc.*, v. *Brant Constr. Co.*, 780 F.2d 691, 694-95 (7th Cir. 1985).

**1.      Parallel Proceedings**

AXA does not argue that the actions are not parallel. "A suit is parallel when

substantially the same parties are contemporaneously litigating substantially the same issues in

another forum." *Caminiti & Iatarola, Ltd.* v. *Behnke Warehousing, Inc.*, 962 F.2d 698, 700 (7th

Cir. 1992) (internal quotation marks and citation omitted). In determining whether two actions

are parallel, a court "look[s] not for formal symmetry between the two actions, but for a

substantial likelihood that the state litigation will dispose of all claims presented in the federal

case." *Lumen*, 780 F.2d at 695. Because URC's Third-Party Petition against AXA seeks a

determination of AXA's obligations under the reinsurance agreements, the same issues that will

be resolved in this case, the court concludes that the Texas Action is parallel to the instant case.

The court must then apply the *Colorado River* factors.

## 2.     *Colorado River* Factors

In considering the list of factors, the court is to "balance the considerations that weigh in favor of, and against, abstention, bearing in mind the exceptional nature of the measure." *Finova Capital Corp.*, v. *Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 898 (7th Cir. 1999). Several of the factors are not in dispute:

The parties agree that the state court has not assumed jurisdiction over property (factor 1), a factor weighing in AXA's favor. The parties agree that the instant case was filed on the same day as the Texas Action (factor 4), although this factor has little independent relevance. *See J & A Sales and Mktg., Inc.* v. *J.R. Wood, Inc.*, No. 01 C 6749, 2002 WL 653897, at *4 (N.D. Ill. April 19, 2002) (Kocoras, J.) ("This is especially true in cases like this one, in which the respective complaints are filed within hours of each other, making priority of filing mostly serendipitous."). The parties agree that the source of governing law is state, not federal (factor 5), which intuitively suggests abstention but, because the court has jurisdiction, it is readily outweighed by other factors. *See Evans Transp. Co.* v. *Scullin Steel Co.*, 693 F.2d 715, 717 (7th Cir. 1982) ("[W]e are not free to treat the diversity litigant as a second-class litigant, and we would be doing just that if we allowed a weaker showing of judicial economy to justify abstention in a diversity case than in a federal-question case."). The parties agree that both courts have jurisdiction over the subject matter (factor 8) and that removal of the Texas Action is not available to AXA as a third-party defendant (factor 9). *See BJB Co.* v. *Comp. Air Leroi*, 148 F. Supp. 2d 751, 752 (N.D. Tex. 2001) ("third party defendants are not defendants within the meaning of § 1441(a)"); *Sturman* v. *Rush-Presbyterian St. Luke's Med. Ctr.*, 128 F. Supp. 2d 1141, 1142 (N.D. Ill. 2001) (same). *See BJB Co.*, 148 F. Supp. 2d at 754 (a third-party may

11

remove a third party claim only if the basis for federal subject matter jurisdiction is the existence

of a federal question.). It is clear that, because both AXA and URC have submitted Rule 26(a)

disclosures and that the discovery already made in the New York action substantially covers the

issues here (Pl. Resp. at 16), the instant case has progressed further than the Texas Action (factor

7), in which the insurers and reinsurers have filed only general denials and the third-party

complaint. Moreover, because of the multiple parties in the Texas Action it is likely that the

instant case could be resolved more quickly than the Texas Action, a factor favoring AXA. In

addition, because there is no federal claim, rather jurisdiction is based in diversity, the adequacy

of the Texas state court to protect AXA's federal rights (factor 6) and the vexatious or contrived

nature of the federal claim (factor 10) are immaterial. In light of the presumption in favor of

exercising jurisdiction, it follows that at least seven factors point away from abstention.

We are left, then, with two disputed considerations: whether the federal forum is

inconvenient (factor 2) and the desirability of avoiding piecemeal litigation (factor 3).[5]

a. The inconvenience of the federal forum

The appropriate inquiry under this factor is the "relative inconvenience of the competing

fora to the parties." *AAR Int'l Inc.,* v. *Nimelias Enter. S.A.*, 250 F.3d 510, 522-23 (7th Cir.

2001). This is similar to the question presented on a motion to transfer venue under 28 U.S.C. §

1404(a),[6] where the court considers the plaintiff's choice of forum (Northern District of Illinois);

the situs of material events (neither party suggests that Illinois or Texas is a situs of material

---

[5] The court recognizes that the list of factors is non-exclusive, but the parties have adhered to the 10-factors set out in *LaDuke*, and the court confines its discussion to those factors as well.

[6] "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

events); the relative ease of access to sources of proof in each forum (neither party suggests that

Texas or Illinois is a significant source of proof); and the comparative convenience of the

respective fora for the litigation. *E.g., Brandon Apparel Group, Inc.* v. *Quitman Mfg. Co.*, 42 F.

Supp. 2d 821, 833 (N.D. Ill. 1999) (citations omitted); *see also Recycling Sci. Int'l, Inc.* v. *Soil*

*Restoration and Recycling, L.L.C.*, 159 F. Supp. 2d 1095, 1099-1100 (N.D. Ill. 2001) (listed as

"the private interests of the litigants"). URC argues that the federal forum is inconvenient

because the Cash Flow Insurance Policy was issued to a Texas insured (Chase) and provides for

the application of Texas law and that Illinois is, at best, a randomly chosen forum. AXA

responds that from a geographical perspective the Texas state court provides no advantages over

this court, as both parties will have to travel by air from either California or France. AXA also

argues that Illinois is not a randomly chosen forum because Illinois or New York law should

apply to the contracts at issue.

Although neither party has significant physical connection with either Texas or Illinois, it

is clear that, because other reinsurers besides AXA are involved in the Texas Action who do not

or cannot oppose the Texas forum, all parties, including AXA, will be litigating in Texas even if

this court declines to abstain. Thus, there is little to be gained even to AXA by proceeding in

both Illinois and Texas in terms of geographical convenience. At the same time, AXA has

chosen the Northern District of Illinois, which under § 1404(a) considerations and by virtue of

the presumption under the *Colorado River* doctrine, indicates that, unless outweighed by other

factors, the case should proceed here.

The principal consideration here is the dispute between the parties as to whether Illinois,

New York, or Texas law governs the dispute and what consequences should flow from that

determination. URC relies on the Texas forum selection clauses of the insurance agreements in support of convenience of the Texas forum and argues, further, that the issue of the forum selection clause was decided in the New York action and cannot be relitigated here. AXA, in support of convenience of the Illinois forum, relies on its view that Texas law does not control the agreements. If Texas law is to apply to the controversy, Texas courts are undoubtedly best suited to interpret Texas law. If Illinois law applies, perhaps the Illinois federal court is better suited than the Texas state court to interpret Illinois law. If New York law applies, either court is in unfamiliar territory.

The court does agree with AXA that nothing in the jury answers to special interrogatories or the trial court record suggests that URC's promise to file the policies in Illinois with provisions for New York or Illinois law and jurisdiction was not binding.[7] To the extent that AXA claims simply that URC breached their reinsurance contract by not refiling the insurance documents in Illinois, it does not touch the adjudicated issue that AXA is liable to Chase under the Loss Payee Endorsement. URC was not a party to that action and AXA had no opportunity to litigate the issue there, nor was AXA required to join URC in order to obtain a determination on the claims between AXA and Chase.[8]

On the other hand, AXA's argument poses a quandary. AXA argues that Illinois or New

---

[7]In its answers to the special interrogatories, the jury answered "yes" to the question "On July 9, 1999, was there an agreement between AXA and URC with respect to the language of the cut through agreement?" (Def. Reply Ex. A.) As AXA points out, however, the cut through agreement is not the reinsurance agreement between AXA and URC. It merely allows Chase to collect directly from AXA. The decision of the Supreme Court (Def. Reply Ex. B) demonstrates that AXA was asserting URC's defenses against Chase, not its own defenses against URC.

[8]Under New York law, issues decided are given collateral estoppel effect if "the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *Parker* v. *Blauvelt Volunteer Fire Co.*, 712 N.E. 2d 647, 651 (N.Y. 1999).

York law controls their reinsurance contract with URC because the agreement between AXA and URC (to file the policy documents in Illinois and to change the forum selection clause from Texas to Illinois or New York law and jurisdiction) became part of the reinsurance agreement itself.[9] This, however, does not indicate that Illinois law applies because, for Illinois law to apply, there has to be an insurance filing in Illinois as no other connection with Illinois is asserted. Clearly, there was no such filing because AXA alleges breach of an agreement to do just that. Thus, even if the forum selection clause of the insurance documents is disregarded, the law that necessarily would decide AXA's claims would be based on a choice of law analysis and certainly would not be Illinois law, where no parties appear to be based and no transactions took place. For this reason, the court is not persuaded that Illinois law applies.

Both because the Texas Action is more comprehensive and because Illinois lacks connection to this case, the court is persuaded that Illinois is not a more convenient forum than Texas.

### b. The desirability of avoiding piecemeal litigation

URC's main argument for a stay based on *Colorado River* centers on the importance of avoiding piecemeal litigation. Piecemeal litigation occurs "when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *Day* v. *Union Mines, Inc.*, 862 F.3d 652, 659 (7th Cir. 1998). As URC points out, this case presents piecemeal litigation concerns because two different courts are deciding some of the same issues, and the state court suit is more comprehensive than the suit here. *See Midwest Dental Prod. Corp.* v.

---

[9]AXA argues that the reinsurance agreement consisted of a series of agreements, including (1) the reinsurance slips, (2) the Cash Flow Insurance Policy, (3) a Loss Payee Endorsement (cut through agreement), and (4) the oral promises and July 7 and 8, 1999 letters from URC to AXA. (Compl. ¶ 127.)

15

*Kinetic Instruments, Inc.*, No. 89 C 7289, 1990 WL 19973, at *7 (N.D. Ill. Feb. 23, 1990)

(Kocoras, J.) In *Midwest Dental*, under similar circumstances, the court explained:

> The classic case where piecemeal litigation concerns arise are in those situations where the state court suit is more comprehensive than the federal court suit. In such a case, the federal court will be able to resolve only a portion of the dispute whereas the state court will be able to decide the entire case, including that portion duplicated in federal court. By staying its proceedings, the federal court avoids litigating a mere piece of the dispute and allows for a more economical and comprehensive administration of the law suit.

*Id.* This factor weighs in favor of staying the instant suit, as the Texas Action deals with similar issues and is more comprehensive than the present suit because all parties in interest are joined, not just AXA and URC. It should be noted, however, that piecemeal litigation cannot be completely avoided in this case. Issues have already been decided in New York courts, and will be decided in Texas and in this court. While this is problematic, piecemeal litigation, in and of itself, can hardly be called "exceptional circumstances." *See Evans Transp. Co.*, 693 F.2d at 717 ("[I]t is not enough, to justify abstention, that a failure to stay the federal suit may result in judicial diseconomy—in having two lawsuits instead of one. That will always be possible when there is a parallel state suit pending.").

3. **Summary**

Weighing the factors and keeping in mind that a stay should be granted only under "exceptional circumstances," the court concludes that a stay is inappropriate under *Colorado River*. URC is persuasive on two factors: avoidance of piecemeal litigation and convenience of the parties (although the convenience of the Texas forum rests solely on URC's expectation that Texas law will govern, rather than actual convenience); and piecemeal litigation, as previously stated, is inevitable in this situation and not enough to justify abstention. The eight other

16

factors, however, are either neutral or weigh in favor of AXA. Thus, where the court is not to abstain absent exceptional circumstances, this court concludes that those circumstances are not present.

## B.    Motion to Stay or Dismiss under 735 ILCS 5/2-619(a)(3)

In the alternative, URC argues that this case should be stayed or dismissed pursuant to 735 ILCS 5/2-619(a)(3). This being a diversity action, the court applies Illinois substantive law. *Erie R.R. Co.* v. *Tompkins*, 304 U.S. 64 (1938); *In re Air Crash Disaster Near Chicago*, 803 F.2d 304, 313-14 (7th Cir. 1986). The court must still, however, apply federal procedural law, and to that end, if 735 ILCS 5/2-619(a)(3) is procedural, the court need not apply it. *In re Air Crash*, 803 F.2d at 313-14. 735 ILCS 5/2-619(a)(3) provides in part:

> Defendant may, within the time for pleading, file a motion for dismissal of the action or other appropriate relief upon any of the following grounds: ***that there is another action pending between the parties for the same cause.

URC maintains that this action should be stayed or dismissed because of the Texas Action, which contains the same parties and the same cause of action.

Considerable debate exists among the courts in this district as to whether § 2-619(a)(3) is substantive or procedural, with little guidance from the Seventh Circuit. Generally, courts that have found § 2-619(a)(3) to be substantive have relied on *Seaboard Fin. Co.,* v. *Davis*, 276 F. Supp. 507 (N.D. Ill. 1967) (Will, J.), where the court found that the predecessor statute to § 2-619(a)(3) should apply in federal diversity actions because variance between state and federal law in this regard would encourage forum shopping, and because no countervailing federal consideration existed to justify such a variance. *Id.* at 515. *See, e.g., Praxair* v. *Slifka*, 61 F. Supp. 2d 753, 761 (N.D. Ill. 1999) (Moran, J.); *Kennihan & Co.* v. *Calphalon Corp.*, No. 98 C

7175, 1999 WL 261830, at *2 (N.D. Ill. April 12, 1999) (Grady, J.); *Suzik* v. *S. Pac. Transp. Co.*, No. 94 C 7793, 1997 WL 156545, at *1 (N.D. Ill. April 1, 1997) (Zagel, J.); *Brach & Brock Confections, Inc.* v. *Redmond*, 988 F. Supp. 1106, 1107 (N.D. Ill. 1997) (Shadur, J.); *Amoco Tax Leasing IV Corp.* v. *Hoosier Energy Rural Elec. Coop., Inc.*, No. 89 C 5710, 1989 WL 152282, at *1 (N.D. Ill. Nov. 6, 1989) (Conlon, J.); *Granite Constr. Co.* v. *Metro. Sanitary Dist. of Greater Chicago*, No. 82 C 6536, 1986 WL 13719, at *3 (N.D. Ill. Nov. 28, 1986) (Williams, J.); *Byer Museum of the Arts* v. *The North River Ins. Co.*, 622 F. Supp. 1381, 1383 (N.D. Ill. 1985) (Holderman, J.). Many of these cases have also focused on the Seventh Circuit's endorsement of *Seaboard* in *Locke* v. *Bonello*, 965 F.2d 534, 538 (7th Cir. 1992). *See Praxair*, 61 F. Supp. 2d at 761.

Cases holding that § 2-619(a)(3) is procedural and therefore not applicable for federal courts sitting in diversity generally find that *Seaboard* was correct when decided, but the Supreme Court's later decision in *Colorado River* results in the conclusion that § 2-619(a)(3) is procedural, not substantive, because *Colorado River* presents a strong federal consideration justifying application of federal law. *See, e.g., MG Capital LLC* v. *Sullivan*, No. 01 C 5815, 2001 WL 1609382, at *5-*6 (N.D. Ill. Dec. 17, 2001) (Darrah, J.); *ADS Publ'g Serv., Inc.,* v. *Summit Group, Inc.*, No. 95 C 6794, 1996 WL 332684, at *1-*2 (N.D. Ill. June 13, 1996) (Norgle, J.); *Beggerow* v. *Affiliated Ins. Consultants, Inc.*, No. 95 C 6677, 1996 WL 197680, at *5 n.2 (N.D. Ill. Apr. 22, 1996) (Marovich, J.); *Fofi Hotel Co.,* v. *Davera Corp.*, 846 F. Supp. 1345, 1347-49 (N.D. Ill. 1994) (Nordberg, J.); *Chicago Title & Trust Co.* v. *Sizes Unlimited, Inc.*, No. 91 C 1079, 1991 WL 119147, at *2 (N.D. Ill. June 28, 1991) (Duff, J.); *W.E. O'Neil Constr. Co.,* v. *Nat. Union Fire Ins. Co. of Pittsburgh, PA.*, 721 F. Supp. 984, 988-89 (N.D. Ill. 1989)

(Rovner, J.). In addition, these courts also found it persuasive that Illinois courts characterize §
2-619(a)(3) as procedural, not substantive. *E.g., People ex rel. Lehman* v. *Lehman*, 215 N.E. 2d
806, 809 (Ill. 1966) ("The purpose of the provision is to foster orderly procedure by preventing a
multiplicity of actions."); *Crowell* v. *Golz*, 744 N.E. 2d 332, 338 (Ill. App. Ct. 2001) ("But, a
motion to dismiss pursuant to section 2-619(a)(3) is procedural in nature. . ."); *Village of
Mapleton* v. *Cathy's Tap, Inc.*, 729 N.E. 2d 854, 856 (Ill. App. Ct. 2000) ("Section 2-619(a)(3) is
an inherently procedural device aimed at avoiding duplicative litigation.").

While recognizing that the arguments for treating the rule as procedural have considerable
force, this court adheres to its previously expressed view[10] that 2-619(a)(3) is substantive and
should be applied in federal diversity cases for two reasons. First, in *Locke*, while the Seventh
Circuit did clarify that it had not decided whether § 2-619(a)(3) would apply in diversity cases,
965 F.2d at 537 n.2, the court did explicitly adopt *Seaboard's* reasoning. *Id.* at 538. Since the
Seventh Circuit's opinion in *Locke* was so strongly based on its assumption that § 2-619(a)(3)
applied, the court feels obligated to give effect to that language. *See Praxair*, 61 F. Supp. 2d at
760-61. Secondly, § 2-619(a)(3) allows a court discretion to stay or dismiss a case where the
same cause and the same parties are present. *Colorado River*, by contrast, applies only in
"exceptional circumstances," and only to stay, not dismiss, a case. If § 2-619(a)(3) were not
applied in diversity cases, the variance between *Colorado River* and § 2-619(a)(3) would give a
litigant an incentive to file state law claims in federal court, where abstention under *Colorado*

---

[10]This Judge previously addressed this issue while a Magistrate Judge, authoring a Report and
Recommendation in *Fofi Hotel Co., Inc.* v. *Davfra Corp.*, No. 92 C 10879, 1992 U.S. Dist. Lexis 10879 (N.D. Ill.
August 4, 1993), finding that § 2-619(a)(3) was substantive because of the Seventh Circuit's opinion in *Locke* and
the variances that exist when *Colorado River* and § 2-619(a)(3) are compared.

*River* would be less likely and at worst would only result in a stay. *Id.* at 761; *Int'l Ins. Co.* v.

*Certain Underwriters at Lloyd's London*, No. 88 C 9838, 1992 WL 675951, at *5 (N.D. Ill. April

29, 1992) (Weisberg, Mag. J.). Therefore, the court concludes that § 2-619(a)(3) is substantive

and thus applies to this diversity case.

As already determined, this case and the Texas Action include the same parties and arise

out of the same core of operative facts. Once this is established, the court must consider factors

similar to those applicable to the *Colorado River* analysis:

> Although the purpose of the law is to avoid duplicative litigation, a circuit court is
> not automatically required to dismiss or stay a proceeding under section 2-
> 619(a)(3) even when the "same cause" and "same parties" requirements are met.
> Multiple actions in different jurisdictions arising out of the same operative facts
> may be maintained where the circuit court, in a sound exercise of its discretion,
> determines that both actions should proceed. Factors a court should consider in
> deciding whether a stay is warranted under 2-619(a)(3) include comity; the
> prevention of multiplicity, vexation and harassment; the likelihood of obtaining
> complete relief in the foreign jurisdiction; and the res judicata effect of a foreign
> judgment in the local forum.

*Zurich Ins. Co.,* v. *Baxter Int'l, Inc.*, 670 N.E. 2d 664, 668 (Ill. 1996). These factors are not "all-

inclusive, and a court may consider additional factors that bear on its discretion." *May* v.

*SmithKline Beecham Clinical Lab., Inc.*, 710 N.E. 2d 460, 465 (Ill. App. Ct. 1999).

"Comity means giving respect to the laws and judicial decisions of other jurisdictions out

of deference." *Id.* at 465. But "principles of comity do not justify staying a matter when the

competing case has only been pending for several months," *Hapag-Lloyd (Am.), Inc.,* v. *Home*

*Ins. Co.*, 729 N.E. 2d 36, 43 (Ill. App. Ct. 2000), or when (as here) it is in its "infant pretrial

stages." *May*, 710 N.E. 2d at 465. In addition, no evidence is brought forth that AXA's claims

in this court are intended to vex or harass URC. Thus, these factors weigh against dismissal.

Other factors, however, do weigh heavily in favor of dismissal. Dismissal will prevent multiplicity due to the similar nature of the actions and the similar nature of the proof presented in both cases. Moreover, the Texas suit is broader and more comprehensive than the instant case because all of the parties are present, and, therefore, complete relief can be afforded only in the Texas Action. *See Skipper Marine Elec., Inc.,* v. *Cybernet Marine Prod.*, 558 N.E. 2d 324, 327 (Ill. App. Ct. 1990); *Natural Gas Pipeline Co. of America* v. *Phillips Petroleum Co.*, 516 N.E. 2d 527, 533 (Ill. App. Ct. 1987).

In sum, the court concludes that the parties do not have a strong enough relationship to the State of Illinois to outweigh the inefficiencies entailed in duplicative litigation. *See A.E. Staley Mfg. Co.,* v. *Swift & Co.*, 419 N.E. 2d 23, 27 (1981) (considering whether the case has "legitimate and substantial relationship to Illinois"). Neither plaintiff nor defendant has its principal place of business in Illinois, and while AXA argues the relationship to Illinois stems from the fact that Illinois law should apply, the court has already indicated it considers this an unlikely outcome. At least, it finds AXA's argument that Illinois law would apply outweighed by the fact that the entire action may be litigated and decided in its entirety in Texas. Finally, the court can discern no great prejudice that would result from AXA having to litigate its claims in Texas. Thus, overall, the entire controversy could be more efficiently resolved in the Texas Action. Finally, this court finds no persuasive reason to stay rather than dismiss, and for these reasons, under 735 ILCS 5/2-619(a)(3), the court exercises its discretion to dismiss the case.

**CONCLUSION**

For the reasons stated above, the court grants defendant's motion to dismiss [#7].

ENTER: _Joan H. Lefkow_
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: October 9, 2002