Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3016 | **DATE** | 11/9/2004 |
| **CASE TITLE** | AXA Corporate Solutions vs. Underwriters Reinsurance Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, defendant's motion for summary judgment [#68] is denied as to Counts I, III, IV, and V but granted as to Count II. Plaintiff's motion for summary judgment [#55] on defendant's counterclaims is granted as to Counts I, II, and III.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | NOV 1 5 2004 date docketed | |
| | Notified counsel by telephone. | | | 113 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 11/9/2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MD | courtroom deputy's initials | | MD mailing deputy initials | |

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| AXA CORPORATE SOLUTIONS, formerly known as AXA REASSURANCES S.A., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 02 C 3016 Judge Joan H. Lefkow |
| UNDERWRITERS REINSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |



## MEMORANDUM OPINION AND ORDER

This case arises from a series of agreements involving insurance-backed film financing between plaintiff, AXA Corporate Solutions, formerly known as AXA Reassurances S.A. (either or both, "AXA"), and Underwriters Reinsurance Company ("URC"). AXA's amended complaint alleges that AXA is entitled to damages from URC as a result of URC's breaching its duty of utmost good faith (count I), warranties (count II), contract (count III), and duty of disclosure (count IV), as well as for promissory estoppel/promissory fraud (count V). URC has asserted counterclaims against AXA seeking damages on theories of breach of contract (counterclaim I) and promissory estoppel (counterclaim II), in addition to attorneys fees pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code (counterclaim III). Diversity jurisdiction is properly invoked pursuant to 28 U.S.C. § 1332(a)(2) as AXA is a French reinsurance company with its principal place of business in Paris, France, and URC is an insurance corporation organized under the laws of the state of New Hampshire with its current principal place of business in Armonk, New York. During the times relevant to this lawsuit, URC's principal place of business was located in Calabasas, California. The

amount in controversy exceeds $75,000. Before the court are URC's motion for summary judgment as to each count of AXA's amended complaint and AXA's motion for summary judgment as to URC's counterclaims. For the reasons set forth below, the court grants in part and denies in part URC's motion for summary judgment; the court grants AXA's motion for summary judgment as to URC's counterclaims.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella* v.

*Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## BACKGROUND

### A.    A Five Picture Deal

In 1996, Sawtantar Sharma ("Sharma"), a broker of Stirling Cooke Brown Reinsurance Brokers Ltd. ("SCB"), approached AXA and other insurance and reinsurance companies about providing insurance coverage for a syndicated, revolving loan of $100 million (the "Master Facility") to be made by Chase Manhattan Bank, now JP Morgan Chase Bank ("Chase"), to George Litto Productions ("GLP") to cover the production of five films. The Master Facility contemplated the use of insurance-backed gap financing, which meant that insurance companies would underwrite the loans made by Chase to GLP in order to cover any losses or gaps that resulted from a film's failure to yield enough revenue to cover the loan. The Master Facility was structured so that the five films would be cross-collateralized to mitigate against loss such that revenues generated by any of the films could be used to repay the loans on the other films.

In early 1997, AXA and other reinsurers indicated their interest in participating as reinsurers for the Master Facility. AXA also agreed to act as a 100% reinsurer for the "Contingent Extra Expense" ("CEE") policy. This policy, issued by the New Hampshire Insurance Company and underwritten by AIG Europe (UK) Ltd., insured a loan of $6 million (later, $7.5 million). This loan, which became known as the "Working Capital Facility," provided financing for certain development and closing costs. The Working Capital Facility also contemplated that GLP would produce five films and provided that GLP would begin the repayment of the working capital facility after the production of each film, beginning with the second film. Although related to the Master Facility, the Working Capital Facility was a separate loan covered by the separate CEE policy.

URC became involved with the GLP film-financing program in late 1997 when approached by AXA and SCB about providing an insurance policy for the Master Facility that would then be reinsured by AXA and the other reinsurers. URC ultimately decided to participate in the transaction as the fronting insurer for the Master Facility. URC also chose to retain a portion of the risk on the primary and secondary excess layers of reinsurance. In addition, URC considered becoming a lender to GLP under the proposed loan syndication of the Master Facility but never informed AXA about this consideration.

In late 1997 and early 1998, SCB, AXA, and GLP began negotiating the agreements that would govern the financing of the GLP-produced films. URC received a term sheet for the Master Facility that set forth the general parameters of the parties' agreements. The premium was set at 10% of the maximum exposure of the insurance companies (the "Sum Insured"), which in this case meant 10% of $100 million, or $10 million. The parties agreed that the reinsurance would be structured in three layers. This required that claims exhaust the maximum monetary exposure of each layer before the next layer was at risk. Chase further required that AXA execute a Loss Payee Endorsement or "cut-through" agreement. The Loss Payee Endorsement gave Chase the right to deal directly with AXA on any claim as if AXA had issued the insurance policy.

Throughout 1998, URC, SCB, and Chase negotiated and conferred about the language of the insurance policy, including the terms of the policy and the state from which the policy would issue. AXA informed URC that AXA wanted the insurance, reinsurance, and Loss Payee Endorsement agreements to provide that New York law would govern the agreements and that any dispute over the agreements would be settled in New York courts. The parties agreed that the policy and related documents would provide for New York law and jurisdiction. Although URC was aware that it was

4

unable to issue the insurance policy from New York because it did not have the proper license, URC did not disclose this fact to AXA.

Because of URC's inability to issue the policy from New York, URC, Chase, and SCB conferred about the state from which URC should issue the policy and ultimately decided that the policy would issue from Texas. In October 1998, the Texas Department of Insurance ("Texas DOI") notified URC that it would not approve a policy that contained wording giving jurisdiction to New York. URC discussed this issue with Chase but did not advise any of the reinsurers of this development. URC subsequently sent a letter to the Texas DOI in February 1999 regarding the approval of a policy that provided for New York law and New York jurisdiction. In a letter dated February 4, 1999, the Texas DOI informed URC that it would accept a policy providing for New York law and New York jurisdiction.

**B.    A Two Picture Agreement**

By January 1999, GLP had not come forward with a film and the Master Facility was not finalized. In April 1999, GLP announced that it had obtained the rights to produce two films, "The Crew" and "Standing Room Only." Chase agreed to provide GLP with a loan of $89 million, the "Credit, Security, Guarantee and Pledge Agreement," for use as "bridge" financing to fund the two films. This loan would then be rolled over into the $100 million Master Facility once Chase completed syndication of the Master Facility. Chase proposed that URC provide fronting insurance for the Credit, Security Guarantee and Pledge Agreement through a two-picture "Cash Flow Policy." On April 23, 1999, counsel for Chase circulated the initial draft of the "Cash Flow Policy," for "The Crew" and "Standing Room Only." URC submitted the Cash Flow Policy and Loss Payee Endorsement providing for New York law and jurisdiction to the Texas DOI on April 30, 1999. The

5

Loss Payee Endorsement was expressly incorporated by reference in the Cash Flow Policy.

At the beginning of June 1999, one of the reinsurers, Kemper RE, raised concerns about the language of the Cash Flow Policy, including, *inter alia*, that the agreement appeared to favor the insured, GLP, at the expense of the insurers/re-insurers. Kemper RE ultimately withdrew from the transaction on June 2, 1999. On June 4, 1999, Sharma apprised URC of Kemper RE's concerns and its decision to withdraw from the transaction. URC did not inform AXA or the other reinsurers of Kemper RE's concerns.

On June 16, 1999, URC learned that the Texas DOI had changed its position and would not accept a policy providing for New York law and jurisdiction. The Texas DOI gave URC the option of either substituting Texas law and jurisdiction for New York law and jurisdiction or deleting the choice of law and jurisdiction provisions from the policy and Loss Payee Endorsement. The following day, June 17, counsel for Chase issued a memorandum to Sharma and Barry Smith, a lawyer appointed to act on behalf of AXA with regard to the GLP transaction, indicating that URC had informed Chase that the Texas DOI would not approve the policy with the language providing for New York law and jurisdiction. The memorandum further advised that URC had changed the policy to require Texas law and jurisdiction and that Chase agreed to that change. URC then filed amended versions of the Cash Flow Policy and LPE with the Texas DOI on June 18, 1999. The amended versions provided for Texas law and jurisdiction. On June 21, 1999, AXA received a copy of the June 17 memorandum. On June 23, 1999, AXA received draft documents reflecting the change to Texas law and jurisdiction. As of July 2, 1999, both URC and Chase were aware that AXA objected to the change from New York law and jurisdiction to Texas law and jurisdiction.

As a result of the proposed change to Texas law and jurisdiction, AXA demanded changes

6

to the wording of the Loss Payee endorsement in late June and early July 1999. AXA's proposed

changes sought to protect AXA from the potential exposure of having to pay twice or more than its

own share of a loss. URC subsequently agreed on July 7, 1999 to use its "best efforts" to move all

of the policy documents to Illinois. In a letter dated July 7, 1999 from Kathryn Lessman

("Lessman"), then Branch Manager for URC's Western Region, to AXA's counsel, URC specifically

agreed to

> file the Form of Cash Flow Insurance Policy, the Master Policy of Cash Flow
> Insurance, and the Loss Payee (Cut Through) Endorsement (with amendments
> requested by [AXA] today during our telephone conference) for review and
> approval with the Illinois Department of Insurance as soon as practicable. The
> policy and endorsement wording that URC will file with the Illinois Department
> of Insurance (DOI) will designate New York as the choice of law and
> jurisdiction governing the terms of the contract. If the Illinois DOI will not
> approve New York as the choice of law and jurisdiction, then the policy and
> endorsement will be amended to designate Illinois law and courts instead.

(AXA Resp. App. Ex. 65).

In a facsimile sent on July 8, 1999 from Lessman to AXA, Lessman advised that

> Underwriters Reinsurance Company (URC) will use our best efforts and
> endeavors to file with and obtain approval from the Illinois Department of
> Insurance (DOI) for the Form of Cash Flow Insurance Policy, the Master Policy
> of Cash Flow Insurance, and the Loss Payee (Cut Through) Endorsement (with
> amendments requested by you on July 7 during our teleconference). The policy
> and endorsement wording that URC will file with the Illinois DOI will designate
> New York as the choice of law and jurisdiction governing the terms of the
> contract. If the Illinois DOI will not approve New York as the choice of law and
> jurisdiction, then URC will amend the policy and endorsement wording to
> designate Illinois law and courts instead.

> URC also confirms that we will use our best efforts and endeavors to file with
> and obtain approval from the Texas DOI for the Loss Payee (Cut Through)
> Endorsement with amendments requested by you on July 7 during our
> teleconference.

(AXA Resp. App. Ex. 65)

URC also agreed to amend the Loss Payee Endorsement filed in Texas to address AXA's concerns regarding double payment and limiting its exposure to its reinsurance share. URC's in-house lawyer, Jeffrey Gunchick, informed AXA that the Illinois Department of Insurance ("DOI") had given its assurance that it would issue a policy providing for New York law and jurisdiction. However, URC never used its best efforts to obtain approval of the amendments to the Loss Payee Endorsement from the Texas DOI. In addition, URC never used its best efforts to file the Form of Cash Flow Insurance Policy, the Master Policy of Cash Flow Insurance, or the Loss Payee Endorsement with the Illinois DOI.

Following the agreement between AXA and URC, counsel for Chase redrafted the Loss Payee Endorsement, and the parties discussed a number of versions of the Loss Payee Endorsement on July 8, 1999. URC, through Mr. Gunchick, also proposed language for inclusion in the Loss Payee Endorsement and reinsurance slips obligating the reinsurers to pay shares of any extra-contractual claims and claims in excess of policy limits. AXA did not agree to URC's proposed language.

That same day, URC conditionally signed a Form of Cash Flow Insurance, which was the Cash Flow Policy referenced in the Credit, Security, Guaranty and Pledge Agreement. The Cash Flow Policy indemnified Chase for the "Ascertained Net Loss in respect of each Film Production, up to but not exceeding the Sum Insured and requires the Insurer to make payment of the Ascertained New Loss as provided under 'Claims Procedure.'" (URC App. Ex. 23 at UR 002217; AXA Resp. App. Ex. 1 at UR 2217). The Cash Flow Policy defined a "Film Production" as "[a] Qualifying Picture which is the subject of a Declaration." (URC App. Ex. 23 at UR 002219; AXA Resp. App. Ex. 1 at UR 2219). Under the terms of the Cash Flow Policy, a "Declaration" is "made by the

Insured and accepted by the Insurer and the Lead Re-Insurers for the coverage of a Film Production under the Policy, in the form of Schedule 2 herein." (URC App. Ex. 23 at UR 002218; AXA Resp. App. Ex. 1 at UR 2218). The policy designated AXA and Royal & SunAlliance Insurance PLC as the "Lead Re-Insurers." (URC App. Ex. 23 at UR 002220; AXA Resp. App. Ex. 1 at UR 2218).

AXA and URC had not yet reached an agreement as of the morning of July 9, 1999. AXA, by its underwriter Erick Derotte ultimately signed two alternative versions of the Loss Payee Endorsement. The first version, signed unconditionally, specified the extent of AXA's potential exposure so as to prevent AXA from incurring the risks of double exposure and paying more than its share of a loss.[1] The second version was in the form originally filed with the Texas DOI. Mr. Derotte signed this version with a handwritten disclaimer stating "to be amended as agreed." (URC App. Ex. 28; AXA Response App. Ex. 53). Both versions of the Loss Payee Endorsement established that Texas law would govern its construction and that the parties would submit to the jurisdiction of the state courts of Texas in Harris County and the U.S. District Court for the Southern District of Texas.

Mr. Derotte also signed the reinsurance slips, which specified: "All amendments, alterations, and declarations to be agreed by Reinsurers hereon." (AXA Resp. App. Ex. 2). The AXA stamp

---

[1]This version of the Loss Payee Endorsement

relat[ed] to 57.72% of the primary layer of $18,690,000, 75.75% of the first excess layer of $25,810,00 and 36.2% of the second excess layer of $44,500,000 of the risk of the Direct Insurer under the Policy for which Re-Insurer is a re-insurer and for which Re-Insurer is agreeing to be directly and only liable to the Insured. Re-Insurer shall be responsible only for such amounts payable under the Policy as its reinsurance share and shall have no responsibility with regard to the remaining portion payable under the Policy. Any payment by Re-Insurer of its share of the claim hereunder to the Insured shall, to the extent of such payment, constitute a discharge of its obligations as Re-Insurer.

(URC App. Ex. 29 at ¶ 2; AXA App. Ex. 52 at ¶ 2).

by which Mr. Derotte executed the slips similarly specified: "ALL TERMS AND AMENDMENTS TO BE AGREED." (AXA Resp. App. Ex. 2). The reinsurance slips established AXA's obligation to pay under the Primary Layer of Reinsurance ($18,690,000) 57.72% of any claim within that layer (or 60.20% of 95.88% of the layer not retained by URC). AXA was obligated to pay 75.75% of any claim within the First Excess Layer ($25,810,000); and 36.20% of any claim within the Second Excess Layer ($44,500,000). The reinsurance slips further allocated how Chase would pay premiums and expenses to the insurers and reinsurers. Under the reinsurance slips, AXA was to receive 57.57% of the premium due on the Primary Layer of reinsurance, 75.75% of the premium due on the First Excess Layer of reinsurance, and 36.20% of the premium due on the Second Excess Layer. AXA then forwarded the signed documents to SCB.

**C.     Additional Agreements and Continued Negotiations**

Concerns immediately arose because URC had previously rejected the first version of the Loss Payee Endorsement that AXA had executed unconditionally. In addition, Chase found the second version of the Loss Payee Endorsement unacceptable because of the "to be amended as agreed" qualification. URC, however, ultimately accepted the first version of the Loss Payee Endorsement. URC, Chase, and SCB also entered into letter agreements providing that: (1) SCB would use its "best endeavors" to obtain amendments to the reinsurance slips;[2] (2) Chase would not, and would not authorize Chase Bank of Texas, "(i) in any action against Underwriters Reinsurance Company, to seek punitive or exemplary damages or (ii) to institute any proceeding to enforce the

---

[2] The proposed amendments provided: "Now this reinsurance is to indemnify the Reinsured in respect of all losses arising on and as the result of the attached contract, including, but not limited to, extra-contractual obligations, losses in excess of policy limits, declaratory judgment expenses, and loss adjustment expenses." (AXA Response App. Ex 77 at UR 002248).

10

Policy against Underwriters Reinsurance Company without seeking to join each of the re-insurers . . .;" and (3) "notwithstanding the text of the Policy, Underwriters Reinsurance Company does not have an obligation . . . to insure any additional theatrical motion picture other than "The Crew." (AXA Resp. App. Ex. 77 at UR 002245-002248). AXA and the other reinsurers were not copied on these letter agreements.[3]

The parties dispute whether and to what extent AXA participated in the conversations that eventually yielded the letter agreements. AXA contends that it was not a party to the conversations and was not aware of the agreements until mid-August 1999. *See* AXA RE's Rule 56.1(b) Response To Statement Of Facts And Statement Of Additional Facts That Require The Denial of URC's Motion For Summary Judgment at ¶ 57. URC maintains to the contrary that counsel for AXA, Joelle de Lacroix ("de Lacroix"), participated in conversations during which "Chase explained that, under the agreements in place that it 'would not claim more than was due to them. And not for punitive damages. [Counsel for Chase] also said he will bring everybody to the same court if there was a bad faith claim except those who had paid.'" (URC's Response To AXA RE's Local Rule 56.1 Statement of Undisputed Material Facts at ¶ 27). AXA had not heard anything from Chase, Sharma, or URC regarding the GLP transaction and presumed that the transaction was "okay" until having a meeting with Sharma on or about July 21, 1999. (AXA Resp. App. Ex. 118D at P. 98-100). Since the closing of the transaction, URC and Sharma had exchanged a series of faxes concerning URC's proposed changes to the cover notes, reinsurance slips, and reinsurance agreements. URC

---

[3]URC disputes that the letter agreements were "side agreements." *See* Underwriters Reinsurance Company's Response To AXA RE's Local Rule 56.1 Statement of Undisputed Material Facts at ¶30. URC, instead, maintains that the letters "confirm[ed] URC, Chase, and SCB's understanding of the responsibilities under the Cash Flow Policy and [Loss Payee Endorsement] executed on July 9, 1999." *Id.*

requested that Sharma undertake "immediate efforts to have all reinsurers on this placement sign the amended cover note per URC's requested changes . . ." (AXA Resp. App. Ex. 80). In a fax dated July 20, 1999, Lessman, on behalf of URC, informed Sharma that "URC cannot approve the loss payee (cut-through) endorsement wording that AXA has signed, as we feel it is contradictory in its intent." (AXA Resp. App. Ex. 82).

Sharma met with de Lacroix on July 21, 1999 and attempted to continue negotiating the language of the Loss Payee Endorsement. On July 27, 1999, Sharma faxed de Lacroix a number of documents, including a copy of the Loss Payee Endorsement that URC had approved and additional reinsurance language. The following day, Sharma informed AXA that "URC will not ever approve cut-thru [*sic*] wording AXA has proposed." (AXA Resp. App. Ex. 90).

## D. Chase Tenders the Premium for "The Crew"

In or around September 1999, Chase tendered to URC the gross premium of $1,163,508 for "The Crew." URC then instructed Sharma to distribute the premium to AXA and the other reinsurers, including reinsurers of the second excess layer. AXA and URC, however, disputed whether Chase tendered the correct premium. AXA looked to Schedule 1 of the Cash Flow Policy, which provided that the amount of premium to be paid under the policy would be ten percent of the Sum Insured, or 10 percent of $89 million. URC, by contrast, relied upon the Qualifying Picture Declaration, which declared that the amount of premium for "The Crew" was $1,163,508. AXA maintains that $1,163,508 was "'far less' than the ten percent of the sum insured." (AXA RE's Rule 56.1(b) Response at ¶ 77). AXA declined acceptance of the premium and retained outside counsel to investigate the circumstances and to advise AXA on how to proceed.

**E.     New Versions of the Form of Cash Flow Insurance Policy**

On February 16, 2000, Lessman faxed Sharma three signed copies of the Form of Cash Flow Insurance Policy that were in the "same format as the one we filed in Texas." (AXA Resp. App. Ex. 104). These policies, however, reallocated the reinsurance layers, placing the second excess layer of reinsurance at risk for "The Crew." In addition, the Sum Insured was stated as being $24,196,399 in the revised policy, rather than $89,000,000. The "Amount in Dollars" was stated as $24,196,399, rather than $89,000,000. Lessman also included a backdated "Declaration No. 1" as "Schedule 2" to the revised Form of Cash Flow Insurance policy. (AXA Resp. App. Ex. 104). Chase, AXA, and the other reinsurers did not approve the revised Form of Cash Flow Insurance policy.

**F.     The New York Action**

On October 19, 1999, AXA filed suit against Chase in the Supreme Court for New York County, seeking a declaratory judgment that AXA was not liable for any claim made by Chase against it for losses under the Cash Flow Policy. Chase also instituted an action against AXA in New York to recover based on the Loss Payee Endorsement. The two cases were consolidated ("the New York Action")[4] and the parties were realigned so that all issues could be resolved in one trial. New pleadings were filed with Chase as plaintiff, AXA and the New Hampshire Insurance Company as defendants, and SCB and Sharma as third-party defendants. URC was not a party to the New York Action. The New York Action was tried to a judge and jury from October 29, 2001 to December 6, 2001.

---

[4]*Chase Manhattan Bank* v. *New Hampshire Ins. Co. and AXA Reassurance S.A.*, No. 602759/01; *AXA Reassurance S.A.* v. *Stirling Cooke Brown Holdings, Ltd. and Stirling Cooke Brown Reinsurance Brokers Ltd., and Sawtantar Sharma*, No. 590872/01; and *New Hampshire Ins. Co.* v. *Stirling Cooke Brown Holdings Ltd. and Stirling Cooke Brown Reinsurance Brokers Ltd.*, No. 590917/01.

In responding to the special interrogatories posed, the jury found that (1) on July 9, 1999, there was "an agreement between AXA and URC with respect to the language of the cut through endorsement;" (2) URC agreed "to insure the loan for "The Crew" on the policy terms that existed in the AXA policy as of July 9, 1999;" (3) Ms. Sharma did not "intentionally make any material statements (other than those relating to finances) to any AXA representative that she knew were false or that were 'recklessly false;'" and (4) Ms. Sharma, did not, "intentionally and with an intent to deceive, fail to provide information to AXA that should have been provided in the exercise of 'utmost good faith' . . ." (URC App. Ex. 36).

In an opinion issued on May 23, 2002, the New York court confirmed its rulings in favor of Chase. The court found that AXA was fully aware that the Cash Flow Policy and Loss Payee Endorsements provided for Texas law and jurisdiction before executing the agreements. The court further found that "Chase, which was not obligated to provide more than $12 [million] from its own resources, nevertheless agreed to provide $89 [million] as bridge financing to fund two films, to be rolled over into the $100 [million] facility once syndication had been established." (URC App. Ex. 4 at P. 81). The court also found that "no document in the form of Schedule 2 was presented to the insurers at or before closing. Instead, the document that was presented was in the form of the Qualifying Picture Declaration that GLP was required to present to Chase." *Id.* at 93. The court determined that just prior to July 9, 1999, AXA had issued "Endorsement No. 1," which states:

> ATTACHING TO AND FORMING PART OF CONTRACT No.: AH 0129799
>
> The declaration to the original policy in respect of "THE CREW" is seen, noted and agreed by the Lead Reinsurers.
>
> Full documentation held on Stirling Cooke Brown's File seen, noted and agreed by the Lead Re-Insurers.

All other terms, clauses, conditions and warranties remain unaltered.

*Id.* at 93 (emphasis in original). The court held that this endorsement acted as an independent waiver of any defects in the declaration that was provided and that the conduct of the parties also independently acted as a waiver. In addition, the court found that "the transaction was not contingent on GLP's acquiring rights to Standing Room Only or, for that matter, on GLP's acquiring the rights to any additional films." *Id.* at 27. Because the amount of Chase's claim remained disputed, the court did not enter a judgment. The court did not award attorneys' fees to Chase.

The court ultimately entered judgment in favor of Chase on December 19, 2002. The court ordered AXA to pay approximately $6.3 million to Chase under the Cash Flow Policy and Loss Payee Endorsement. AXA appealed the judgment, posting an appeal bond to cover the amount of Chase's claim under the Loss Payee Endorsement. The Court of Appeals of New York denied AXA's motion for leave to appeal the verdict and judgment. AXA and Chase reached a global settlement in October 2003 that resolved AXA's liability to Chase on the Cash Flow Policy and LPE.

**G.    The Texas Action**

In a letter dated April 2, 2002, Chase demanded that URC, AXA, and the other reinsurers pay its share of Chase's $13,107,881.98 claim on April 26, 2002, the Claim Payment Date. URC sent a letter dated April 10, 2002 to the reinsurers, AXA, Royal and SunAlliance Insurance PLC ("Royal"), General Star International Indemnity Ltd. ("Gen Star"), and Caisse Centrale De Reassurance S.A. ("CCR"), proposing that they "coordinate [their] claims handling activities." (AXA App. Ex. 60). URC, AXA, Royal, Gen Star, and CCR did not pay Chase's claim on the Claim Payment Date.

Chase subsequently filed suit against URC, Royal, Gen Star, and CCR in an action entitled

15

*JP Morgan Chase Bank* v. *Royal & SunAlliance Insurance PLC, et al.,* Cause No. 2002-21546, in the District Court of Harris County, Texas (the "Texas Action"), alleging breach of contract for failure to pay its claim of $10,581.839.71 under the Cash Flow Policy and/or the Loss Payee Endorsements. Chase did not name AXA as a defendant in the Texas Action because of the pendency of the New York Action. Chase notified the court that it would amend its complaint in the Texas Action "to reduce its claim against URC by the amount of any recovery it obtains from AXA pursuant to any judgment" in the New York Action. (AXA App. Ex. 7 at ¶ 35). On June 10, 2002 URC filed a third-party complaint against AXA in the Texas Action alleging breach of the reinsurance contract and seeking declaratory relief against AXA. In responding to Chase's complaint in the Texas Action, URC, Royal, Gen Star, and CCR generally denied the allegations. In its First Amended Answer to Chase's complaint, URC denied that Chase (1) had "met all conditions precedent under the contract," (2) had "paid the total amount of premium in accordance with the provisions of the policy," and (3) had "presented a completed Declaration." (AXA App. Ex. 67 at ¶¶ 3-5). URC, Gen Star, and CCR continued to maintain that Chase's claim was not valid and to dispute the amount of the claim in the Texas Action after the New York court had issued its opinion. CCR also had demanded that URC initiate its investigation of Chase's claim because if there was an agreement, URC would be the primary carrier and would need to be adjusting the loss. URC requested that Chase conduct an audit of "The Crew" on August 14, 2002.

Chase conducted settlement negotiations with each of the defendants in the Texas Action. The court dismissed Chase's claims against CCR with prejudice due to a settlement between the parties on April 11, 2003. The court similarly dismissed Chase's claims against Royal with prejudice due to a settlement between the parties on May 8, 2003. The court also dismissed Chase's

claims against Gen Star with prejudice as a result of settlement on September 19, 2003. In addition, Chase and URC conducted settlement negotiations. URC paid Chase $50,000 to settle Chase's claims. The Texas court dismissed Chase's claims against URC with prejudice on November 11, 2003.

## H.    The Present Action

AXA filed the present action against URC on April 26, 2002. In this action, AXA seeks to hold URC liable for the damages AXA sustained in satisfying the New York judgment in favor of Chase, for the legal fees and costs AXA incurred in New York and Illinois, the legal fees and costs AXA paid and will pay to defend itself in the Texas action, and any damages awarded under Chapter 38 of the Texas Civil Practice and Remedies Code. URC's counterclaims similarly seek to hold AXA liable for the damages and expenses URC incurred incident to the New York action, the Texas action, the defense of the present lawsuit, and discovery disputes by and between URC and AXA in California. URC also seeks its attorneys' fees from AXA pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code.

## DISCUSSION

## I.    Collateral Estoppel

In support of its motion for summary judgment, URC asserts that collateral estoppel precludes AXA from relitigating the parties' contractual obligations because those issues were decided in the New York Action. 28 U.S.C. § 1738 requires that federal courts give effect to the collateral estoppel rules of the state that rendered the prior judgment where the same issues are raised later in a federal proceeding. *Migra* v. *Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 79 L. Ed. 2d 56, 104 S. Ct. 892 (1984); *Am. Nat. Bank & Trust Co. of Chicago* v. *Regional Transp.*

*Authority*, 125 F.3d 420, 430 (7th Cir. 1997); *Wilder* v. *Thomas*, 854 F.2d 605, 616 (2d Cir. 1988). Thus, this court's determination of the preclusive effect of the New York Action in this case requires an analysis of the collateral estoppel effect that would be accorded the prior judgment under New York's standards for collateral estoppel. *Wilder*, 854 F.2d at 616.

Under New York law, issues decided are given collateral estoppel effect if "the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *Parker* v. *Blauvelt Volunteer Fire Co.*, 712 N.E.2d 647, 651, 93 N.Y.S.2d 343, 690 N.Y.S.2d 478 (1999). The proponent of collateral estoppel bears the burden of demonstrating "the identicality and decisiveness of the issue," while the opponent bears the burden of establishing "the absence of a full and fair opportunity to litigate the issue in the prior action or proceeding." *Id.* (quoting *Ryan* v. *N.Y. Tel. Co.*, 467 N.E.2d 487, 490, 62 N.Y.2d 494, 478 N.Y.S.2d 823 (N.Y. 1984)).

In Count I of its amended complaint, AXA alleges that URC breached its duty of utmost good faith to AXA that arose by virtue of their reinsurance relationship by failing to disclose all material facts relating to the risk of loss under the Cash Flow Policy and its reinsurance. AXA contends that URC breached this duty by (1) concealing its inability to issue the policy from New York; (2) concealing the fact that in October 1998 the Texas DOI informed URC that it would not approve a policy that provided for New York law and jurisdiction; (3) misrepresenting that it would file an amended Loss Payee Endorsement in Texas; misrepresenting that it would also file the Cash Flow Policy and Loss Payee Endorsement in Illinois to provide for New York law and jurisdiction; (4) failing to disclose that it wanted to participate as an insured under the Master Facility; (5) failing to disclose Kemper RE's reasons for withdrawing from the transaction; and (6) entering into letter

agreements with Chase after URC had executed the reinsurance slips.

AXA further asserts that URC breached its duty of utmost good faith by insisting that no additional films would be made unless the reinsurers agreed to indemnify URC for damages in excess of policy limits and punitive damages; by failing to change the structure of the reinsurance layers to correspond to the new loan amount after URC reached its side agreement with Chase; by failing to enforce the conditions precedent to coverage when it did not obtain a Schedule 2 Declaration for "The Crew" and then backdated the documents to conceal that failure; and by failing to conduct an investigation into AXA's claims in the New York Action that the Cash Flow Policy was invalid and that the conditions precedent to coverage were not met.

URC, however, maintains that the New York Action resolved these issues. URC points to the similarities in the AXA's allegations against Sharma in the New York Action and the present action. In the New York Action, AXA contended that Sharma was Chase's agent, and, consequently, Chase was liable for her actions. In the present action, AXA asserts that Sharma was URC's agent and, by virtue of that relationship, URC is liable for her actions. URC also directs the court's attention to AXA's claims raised in the New York Action that Sharma breached her duty of utmost good faith by failing to disclose information to AXA "concerning the change from a commitment for $100 million to a commitment to use best efforts . . .," (URC App. Ex. 2 at P. 4387), by failing to inform AXA of Kemper RE's reasons for withdrawing from the transaction, (URC App. Ex. 2 at 4299), and by failing to disclose the existence of "side deal" agreements reached after URC had executed the reinsurance slips. (URC App. Ex. 2 at P. 4296). AXA similarly asserts in the present action that URC breached its duty of utmost good faith by failing to disclose Kemper RE's reasons for withdrawing from the transaction and by entering into the side agreements with Chase after

executing the reinsurance slips.

The New York jury found that Sharma did not "intentionally make any material statements ... to any AXA representative that she knew were false or that were 'recklessly false.'"[5] (URC App. Ex. 36). The jury further found that Sharma "did not intentionally and with an intent to deceive, fail to provide information to AXA that should have been provided in the exercise of 'utmost good faith.'"[6] *Id.* In order to reach these findings, the jury necessarily determined that Sharma's failure to disclose to AXA the change in commitment from a $100 million transaction to a commitment to use best efforts, Kemper RE's reasons for withdrawing from the transaction, and the existence of the side agreements did not amount to a breach of her utmost duty of good faith.

The parties are collaterally estopped in the present action from relitigating the issue of Sharma's failure to disclose Kemper RE's reasons for withdrawing from the transaction because that issue was litigated in the New York Action and necessary for the jury's determination that Sharma did not breach her duty of utmost good faith to AXA. The court agrees with URC that this conduct does not become actionable by merely changing Sharma's status as the agent of Chase to the agent of URC. AXA also has not provided this court with any basis for its implied contention that the duty

---

[5]The New York court defined material statements or material facts for the jury as "those which are likely to influence the decision of an underwriter, this is facts which had they been revealed or accurately or revealed at all would have either prevented an insurer or a reinsurer from issuing a policy or prompted an insurer reinsurer to issue a policy at a different or higher premium." (URC App. Ex. 2 at P. 4381).

[6]The New York court defined "utmost good faith" as

an obligation to disclose to potential insurers or reinsurers all material facts . . . regarding the risk of loss that are known to the person that owes the duty, that is to the broker. When a person owing that duty, the duty of utmost good faith, has knowledge of circumstances that would influence an insurer's or reinsurer's underwriting decision, that person is obligated to disclose those circumstances, that information or those facts.

(URC App. Ex. 2 at P. 4386).

of utmost good faith of a reinsured differs from that of an insured. AXA's argument that URC's actions should not be evaluated on an intentional misconduct standard is also unavailing because AXA requested that the intent requirement be included in the jury charges in the New York Action.

In addition, the parties are collaterally estopped from arguing and presenting evidence that the Loss Payee Endorsement that Derotte signed unconditionally was not valid and binding on the parties in light of the New York jury's finding that there was an agreement between AXA and URC with regard to the language of the Loss Payee Endorsement on July 9, 1999. Because of the finding of the New York jury that URC agreed to insure the loan for "The Crew" on the terms of the Cash Flow Policy as of July 9, 1999, the parties are collaterally estopped from arguing and presenting evidence that the Cash Flow Policy was not valid and binding.

Collateral estoppel also will apply to preclude the parties from arguing or presenting evidence that AXA was unaware that the Cash Flow Policy and Loss Payee Endorsements provided for Texas law and jurisdiction before executing the agreements and that AXA would not have entered into the agreements if it had been aware that Texas law would apply. The New York court expressly found that AXA was aware prior to signing the agreements that they provided for Texas law and jurisdiction but signed them anyway. The parties also may not argue or present evidence that URC breached its duty of utmost good faith or any other duty or obligation by failing to obtain a Schedule 2 Declaration for "The Crew" prior to closing in light of the finding of the New York court that AXA waived any defects in the declaration that was provided by executing "Endorsement No. 1."

In addition, the parties are collaterally estopped from relitigating whether the transaction was contingent upon GLP's acquiring the rights to any additional films as a result of the New York court's finding that "the transaction was not contingent upon GLP's acquiring rights to Standing

21

Room Only, or, for that matter, on GLP's acquiring the rights to any additional films." (URC App. Ex. 4 at P. 27).

The present action involves more than the issues reached in the New York Action. As this court previously recognized, there is nothing in the jury answers to special interrogatories or the trial court record suggesting that URC's promise to file the policies in Illinois with provisions for New York or Illinois law and jurisdiction was not binding. *See AXA Corporate Solutions* v. *Underwriters Reinsurance Co.*, 2002 WL 31260009 at *8, 2002 U.S. Dist. LEXIS 19407 (N.D. Ill. Oct. 9, 2002). This court construes the agreement to file the amended policies in Illinois as an agreement independent of, but related to, the Reinsurance Agreement for purposes of the present action. The New York jury and the opinion of the New York court also did not reach the issues of whether URC breached its duty of utmost good faith by concealing its inability to issue the insurance policy from New York, by failing to inform URC that the Texas DOI would not approve a policy that provided for New York law and jurisdiction, by misrepresenting that it would file an amended Loss Payee Endorsement in Texas, by failing to disclose that it wanted to participate as an insured under the Master Facility, and by entering into the letter agreements with Chase after URC had executed the reinsurance slips. The New York Action did not reach the issue raised in the present matter as to whether URC breached the reinsurance agreements by eliminating the possibility that another film, satisfying the Qualifying Picture requirements, would be declared and insured unless the reinsurers agreed to indemnify URC for damages in excess of policy limits and punitive damages. The New York action also did not resolve whether URC breached its duty of utmost good faith by failing to change the structure of the reinsurance layers to correspond to the new loan amount after URC reached its side agreement with Chase and by failing to conduct an investigation into AXA's claims

22

in the New York Action that the Cash Flow Policy was invalid and that the conditions precedent to coverage were not met.

## II.    Choice of Law

Since AXA is not collaterally estopped from litigating whether URC breached its duty of utmost good faith, it is necessary to determine whether AXA states a claim for breach of duty of utmost good faith.  Because URC did not file amended versions of the Loss Payee Endorsement and Cash Flow Policy with the Illinois DOI, the court must resolve the quandary of whether Texas law or New York law governs AXA's claims.

A federal court sitting in diversity applies choice-of-law rules in the forum state, which, in this case, is Illinois.  *Smurfit Newsprint Corp.* v. *Southeast Paper Mfg. Co.*, 368 F.3d 944 at 949 (7th Cir. 2004)(*citing Klaxon Co.* v. *Stentor Electric Mfg. Co.*, 313 U.S. 487, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941); *Nelson* v. *Sandoz Pharmaceuticals Corp.*, 288 F.3d 954, 963 n. 7 (7th Cir. 2002).  Illinois law holds that the law applicable to a contract is the law intended by the parties.  *Id.*  When the parties express that intent (such as through a governing law provision), that express intent is generally recognized.  *Id.* (*citing Hofeld* v. *Nationwide Life Ins. Co.*, 322 N.E.2d 454, 458, 59 Ill. 2d 522 (Ill. 1975)("Generally, the law applicable to a contract is that which the parties intended, assuming such an intent.  When that intent is expressed, it should be followed.").  Exceptions to this general rule exist where the express choice of law "would *both* violate fundamental Illinois public policy *and* Illinois has a materially greater interest in the litigation than the chosen state."  *Id.* (*quoting English Co.* v. *Northwest Envirocon, Inc.*, 663 N.E.2d 448, 452, 278 Ill. App. 3d 406, 215 Ill. Dec. 437 (Ill. App. Ct. 1996)(emphasis in original)).

In this case, the agreements at issue, the Loss Payee Endorsement and the Cash Flow Policy,

23

expressly provide for Texas law. Neither party has suggested that these choice of law provisions violate fundamental Illinois public policy or that Illinois has a materially greater interest in the litigation than the chosen state. Normally, the court's inquiry would end there. The present situation, however, is more nuanced.

AXA contends that the agreements do not reflect accurately the intent of the parties and that, instead, the parties intended that New York or Illinois law would apply to the agreements. AXA points to the oral promises and July 7 and July 8, 1999 letters from URC in which URC promised to use its best efforts to file the Cash Flow Policy and Loss Payee Endorsement with language providing for New York or Illinois law and jurisdiction with the Illinois DOI and to file an amended Loss Payee Endorsement with the Texas DOI. AXA contends that these promises and letters became a part of the reinsurance agreement. URC, however, argues that AXA is attempting to vary the terms of a valid and enforceable contract in violation of the parol evidence rule. Because the court cannot decide the choice of law issue without resolving which state's contract interpretation govern, the court will consider the laws of both New York and Texas regarding the interpretation of contracts.[7]

Under New York law, "[i]nsurance policies are, in essence, creatures of contract, and accordingly, subject to the principles of contract interpretation." *In re Estates of Covert*, 761 N.E.2d 571 at 576, 97 N.Y.2d 68, 735 N.Y.S.2d 879 (N.Y. 2001)(*citing Hartol Prods. Corp.* v. *Prudential Ins. Co. of Am.*, 47 N.E.2d 687, 290 N.Y. 44 (N.Y. 1943)). "[T]he objective of contract interpretation is to give effect to the expressed intentions of the parties. . . . Where the language of

---

[7]The court does not consider Illinois law regarding the interpretation of contracts for the reasons previously addressed by the court in its October 9, 2002 memorandum opinion and order. *See AXA Corporate Solutions* v. *Underwriters Reinsurance Co.*, 2002 WL 31260009 at *8, 2002 U.S. Dist. LEXIS 19407 at *24-25 (N.D. Ill. Oct. 9, 2002).

the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Hunt Ltd.* v. *Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989), citing, *inter alia, Hartford Accident & Indem. Co.* v. *Wesolowski*, 305 N.E. 2d 907, 33 N.Y. 2d 169, 171-72, (1973), and *Sutton* v. *East River Sav. Bank*, 435 N.E. 2d 1075, 55 N.Y. 2d 550, 554 (1982). "Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." *W.W.W. Associates, Inc.* v. *Giancontieri*, 566 N.E.2d 639 at 642, 77 N.Y.2d 157, 565 N.Y.S.2d 440 (N.Y. 1990)(*quoting Intercontinental Planning* v. *Daystrom, Inc.*, 248 N.E.2d 576 at 580, 24 N.Y.2d 372, 300 N.Y.S. 2d 817 (N.Y. 1969)).

Similarly, under Texas law, contracts of insurance are governed by the same rules of interpretation and construction that are applicable to contracts generally. *Nat'l Union Fire Ins. Co.* v. *CBI Indus.*, 907 S.W.2d 517 at 520 (Tex. 1995). "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity." *Id.* Moreover, "[w]hether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id.* (*citing Coker* v. *Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *R & P Enterprises* v. *LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980)).

As the jury in the New York action determined, AXA and URC reached an agreement with regard to the language of the Loss Payee Endorsement on July 9, 1999 and URC further agreed to insure the loan for "The Crew" on the terms of the Cash Flow Policy as of July 9, 1999. This court

is bound by those determinations. If the court, instead, found that the oral promises and letters of

July 7 and 8, 1999 were part of the actual reinsurance agreement, the court would be contradicting

the findings of the New York jury and the express language of the Loss Payee Endorsement and Cash

Flow Policy.[8] The laws of contract interpretation for both New York and Texas do not allow the

court to consider extraneous or parol evidence where contracts are clear and unambiguous. Looking

to the agreements, the Loss Payee Endorsement and the Cash Flow Policy are clear and unambiguous

on their face that Texas law applies.[9] The court, consequently, will consider AXA's claims under

Texas law.[10]

## III. Count I - Breach of the Duty of Utmost Good Faith

URC argues that AXA cannot state a claim for breach of duty of utmost good faith because

such a claim is not viable under Texas law. AXA contends that while there is no Texas case that has

dealt with this issue, the Texas Supreme Court has recognized the special relationship between the

---

[8]The parties should note that this determination does not reach the issue of whether the promises and July 7 and 8, 1999 letters constituted an independent, binding agreement between AXA and URC.

[9]The Cash Flow Policy states: "THIS POLICY SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED WITHIN SUCH STATE (WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW RULES)." (URC App. Ex. 23 at UR 002226; AXA Resp. App. Ex. 1 at UR 2226).

The Loss Payee Endorsement similarly states: "THIS LOSS PAYEE ENDORSEMENT SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE (WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW RULES)." (URC App. Ex. 29 at ¶ 8; AXA App. Ex. 52 at ¶ 8).

[10]The court is mindful of the Seventh Circuit's observation that "it is hard to see what more AXA could have done to make it clear that it was not consenting to litigate in Texas," *AXA Corporate Solutions* v. *Underwriters Reinsurance Corp.*, 347 F.3d 272 at 279 (7th Cir. 2003). This court could stretch this observation further to include AXA's argument that it was not consenting to the application of Texas law to the agreements. However, at the time it made this observation, the Seventh Circuit was reviewing this court's conclusion that abstention was inappropriate under the *Colorado River* doctrine. *Id.* at 278-279. The Seventh Circuit was not considering the preclusive effect of the New York Action on AXA's claims. This court finds that the application of Texas law with regard AXA's claims in the instant matter is the approach that best gives effect to the determinations of the New York jury and, at the same time, the guiding principles of contract interpretation.

parties to a reinsurance contract and that there is no reason for this court to assume that Texas would diverge from the principles of New York reinsurance law. *See, e.g., Cunningham* v. *Republic Ins. Co.*, 94 S.W.2d 140 at 142, 127 Tex. 499 (Tex. 1936)("Reinsurance contracts are not policies of insurance. Neither are they contracts of insurance, as that term is generally understood. The parties to a contract of reinsurance are engaged in a kind of joint enterprise in the nature of a copartnership.").

In order to determine questions of state law, federal courts look to the final decisions of the highest court of the state. *See Erie R.R. Co.* v. *Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); *Stephan* v. *Rocky Mountain Chocolate Factory, Inc.*, 129 F.3d 414, 416-17 (7th Cir. 1997). If the state's highest court has not ruled on the issue, the federal court must "use [its] best judgment to determine how that court would construe its own law." *Stephan,*129 F.3d at 417. The court may consider a number of sources, including decisions of the state's lower appellate courts and trial courts, the decisions of federal courts, decisions from other states, and restatements, treatises, and other authorities. *See, e.g., id.* at 417-18 (considering lower appellate authorities, federal decisions, and decisions from other states); *Wells* v. *Liddy*, 186 F.3d 505, 528 (4th Cir. 1999) (court can consider "canons of construction, restatements of law, treatises, recent pronouncements of general rules or policies by the state's highest courts, well considered dicta, and the state's trial court decisions."). Unfortunately, no Texas court has yet issued an opinion or commented on whether a duty of utmost good faith exists between a reinsurer and reinsured. As a consequence, this court is obliged to predict how the Supreme Court of Texas would decide the issue.

The Texas courts have recognized that insurers owe a duty of good faith and fair dealing to their insureds. *See Arnold* v. *Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987).

The Supreme Court of Texas explained its rationale for finding that such a duty exists in the insurance context as follows:

> In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims. For these reasons a duty is imposed that "[An] indemnity company is held to that degree of care and diligence which a man of ordinary care and prudence would exercise in the management of his own business."

*Id.* (*quoting G.A. Stowers Furniture Co.* v. *Am. Indemnity Co.*, 15 S.W.2d 544, 548 (Tex. Comm'n App. 1929, holding approved)). The relationship between a reinsurer and reinsured is different, however, from the relationship between an insurer and insured. *See, e.g., Stonewall Ins. Co.* v. *Argonaut Ins. Co.*, 75 F. Supp. 2d 893 at 908 (N.D. Ill. 1999)("[R]einsurance agreements are separate and distinct from the policy agreements entered into by the insurer and insured." (citation omitted)). The court is also mindful that "[t]he primary mistake of most courts considering reinsurance issues is blindly applying principles of original insurance." *Id.* (*citing* Steven W. Thomas, Note, *Utmost Good Faith in Reinsurance: A Tradition in Need of Adjustment*, 41 Duke L.J. 1548 at 1597 (June 1992)).

As a preliminary matter, "[r]einsurance involves contracts of indemnity, not liability. *Unigard Security Ins. Co., Inc.* v. *North River Ins. Co.*, 4 F.3d 1049 at 1054 (2d Cir. 1993). Through reinsurance, the original insurer diversifies its risk of loss over a larger number of policies and reduces its capital reserves that state law requires to protect the original insured. *Id.* at 1053.

28

Generally, the reinsurer is not directly liable to the original insured,[11] *id.*, and the ceding insurer holds the information concerning the risks. *Id.* at 1066. In addition, reinsurers do not generally examine risks, receive notice of loss from the original insured, or investigate claims. *Id.* at 1054. Moreover, "[r]einsurance involves two sophisticated business entities familiar with the business of insurance who bargain at arms-length for the terms in their contract." Thomas, *supra*, at 1554.

Historically, the nature of reinsurance necessitated that the parties' contractual relations be rooted in "*uberrima fides*," or "utmost good faith." Thomas, *supra*, at 1551. *Uberrima fides* is defined by Black's Law Dictionary as "the most abundant good faith; absolute and perfect candor or openness and honesty; the absence of any concealment or deception, however slight." *Id.* In other words, the maxim of *caveat emptor* or "let the buyer beware" did not apply traditionally to reinsurance agreements. *Id.* This tradition of utmost good faith in the reinsurance context was the result, in part, of the understanding between the reinsurer and the ceding insurer that "they would conduct themselves in a manner of trust and full disclosure that led to long term relationships" and repeat transactions. *Id.*

Times have changed, however, and "[t]he reinsurance market today does not have the same profitable long term relationships that outweigh any single loss, repeat transactions, or dependent on reputation." *Id.* Instead, "whereas utmost good faith once promoted an efficient reinsurance market by allowing the reinsurer to rely on the ceding insurer's disclosure without monitoring, these sophisticated parties must now bargain for adequate protection." *Id.* at 1553. Where once reinsurance law was a "field in which differences [were] settled by handshakes and umpires,"

---

[11] The instant matter presents a unique situation in that the insured, Chase, by virtue of the Loss Payee Endorsement had the right to deal directly with the reinsurer, AXA, on any claim as though AXA had issued the insurance policy.

*Unigard*, 4 F.3d at 1054 (*citing Sumitomo Marine & Fire Ins. Co.* v. *Cologne Reins. Co. of Am.*, 552

N.E.2d 139, 75 N.Y.2d 295, 298, 552 N.Y.S.2d 891 (N.Y. 1990)), the market may now be one of

*"caveat emptor."* *Id.* (*citing* John Milligan-Whyte & Mary Cannon Veed, *Bermudian, English and*

*American Reinsurance Arbitration Law and Practice and Alternative Dispute Resolution Methods*,

25 Tort & Ins. L.J. 120, 124 (1989)). One commentator suggests that where the parties have not

contracted for the duty of utmost good faith or duty of disclosure, courts should "adopt information

forcing rules to give incentives to the ceding insurer to disclose fully and promptly, just as the

market's requirement of utmost good faith once did." Thomas, *supra*, at 1553. *See also Unigard*,

4 F.3d at 1066 ("Courts should thus adopt information-forcing default rules based on the good faith

the reinsurance market demands.").

In the instant matter, the Loss Payee Endorsement affected the relationship between the

insured (Chase), insurer/reinsured (URC), and reinsurer (AXA) such that the relationship between

Chase and AXA became more akin to an insured/insurer relationship rather than that of an

insured/reinsurer relationship. Nevertheless, URC remained the reinsured. The unequal bargaining

positions that are often the norm in the insured/insurer relationship did not exist in the arms-length

negotiations between Chase, URC, and AXA. Nevertheless, this court is persuaded that the Supreme

Court of Texas would likely find that a duty of utmost good faith or, at very least, good faith exists

between a reinsured and reinsurer in both the formation and performance of the reinsurance

agreements in order to maintain an incentive for insurers to give full and prompt disclosure to

reinsurers.[12] Because AXA may assert a claim for breach of URC's duty of utmost good faith and

---

[12]As the Second Circuit reasoned, "[a]bsent such disclosure, reinsurers would have to duplicate actuarial and claims-handling efforts of ceding insurers, and reinsurance would become unavailable." *Unigard*, 4 F.3d at 1066.

because genuine issues of material fact exist as to whether URC breached that duty as evidenced by the number of issues undecided by the New York Action, summary judgment is denied as to Count I of AXA's amended complaint.

## IV.    Count II - Breach of Warranty

In count II of its amended complaint, AXA asserts that URC breached its warranties by amending the underlying Cash Flow Policy without the approval of the reinsurers such that URC was obliged to only insure "The Crew;" by tendering the premium to AXA that was not equal to 10% of the Sum Insured and by distributing the premium to reinsurers that were not at risk, and by failing to make the required filings with the Texas and Illinois DOIs. URC contends that AXA's allegations appear ill-suited for a breach of warranty claim under Texas law. *See* URC Memorandum of Law in Support of Motion for Summary Judgment at P. 21.

Under Texas law, a warranty in an insurance contract is "'a statement made therein by the insured, which is susceptible to no construction other than that the parties mutually intended that the policy should not be binding unless such statement be literally true." *Lane* v. *Travelers Indem. Co.*, 391 S.W.2d 399 at 402 (Tex. 1965)(*quoting Phoenix Assur. Co.* v. *Munger Imp. Cotton-Mach. Mfg. Co.*, 49 S.W. 222, 225 (Tex. 1898)). In order "for a statement in a[n insurance] policy to constitute a warranty, the parties must have intended that the policy stand or fall on the literal truth or falsity of the statement." *Id.* The court considers and construes the entire policy to prevent a forfeiture when deciding whether a statement is a warranty or a representation. *Id.*

The court agrees with URC that AXA's allegations do not state a claim for breach of

warranty under Texas law.[13] If URC breached a warranty, the policy would be rendered invalid. *See Lane*, 391 S.W.2d at 401.[14] AXA also does not dispute that "a breach of warranty *may* be grounds for rendering an insurance contract invalid." (AXA's Response to URC's Motion for Summary Judgment at P. 44)(emphasis in original). Because the New York jury determined that the agreements were valid and enforceable, neither party can assert that the agreements were invalid as a result of a breach of warranty. Thus, summary judgment is granted as to count II of the amended complaint.

## V.     Count III - Breach of Contract

AXA alleges in Count III of the amended complaint that URC breached its contractual obligation to file with the Texas DOI the amended Loss Payee Endorsement to which URC and AXA had agreed on July 9, 1999 and to file with the Illinois DOI the Loss Payee Endorsement and Cash Flow Policy providing for New York law and jurisdiction. AXA further claims that URC breached its contractual obligation by failing to pay AXA the proper premium. As the court discussed above, collateral estoppel does not apply to preclude AXA from asserting that URC breached its promise to file the policies in Illinois with provisions for New York or Illinois law. The New York action

---

[13] AXA seems to concede the impropriety of asserting a claim for breach of warranty by likening the claim to a "breach of contract," a claim also asserted in its amended complaint. *See* AXA's Response to URC's Motion for Summary Judgment at P. 44 ("Whether AXA RE's claim is titled 'breach of warranty,' or simply 'breach of contract,' URC's summary judgment motion as to Count II should be denied.").

[14] The Supreme Court of Texas cited to Art. 21.16 of Vernon's Texas Insurance Code, which provides:

Any provision in any contract or policy of insurance issued or contracted for in this State which provides that the answers or statements made in the application for such contract or in the contract of insurance, if untrue or false, shall render the contract or policy void or voidable, shall be of no effect, and shall not constitute any defense to any suit brought upon such contract, unless it be shown upon the trial thereof that the matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable, and whether it was material and so contributed in any case shall be a question of fact to be determined by the court or jury trying such case.

*Lane*, 391 S.W.2d at 401.

also did not reach the issue as to whether URC breached its contractual obligation to file the amended Loss Payee Endorsement with the Texas DOI.

URC contends, however, that no genuine issue of material fact exists as to whether URC breached its contractual obligation by failing to pay AXA the proper premium as a result of the New York court's finding that AXA approved the Qualifying Picture Declaration for "The Crew," which set the premium at $1,163,508. This court, however, disagrees. Since the Cash Flow Policy set the total gross premium at 10% of the Sum Insured and because URC entered into letter agreements that eliminated the possibility that another film would be declared and insured, the jury may determine that the "total gross premium" for the Cash Flow Policy is the same as the total gross premium for the single film. This leaves open the possibility that URC breached its contractual obligation to collect a premium of 10% of the Sum Insured for "The Crew" from Chase. As a consequence, summary judgment is denied as to Count III.

## VI.    Count IV - Damages for Misrepresentation/Non-Disclosure

Neither party addressed whether there any genuine issues of material fact with regard to count IV of the amended complaint, which asserts that URC is liable to AXA for damages arising from the breach of URC's duty of disclosure. Instead, both parties cite to earlier arguments raised concerning the application of collateral estoppel to AXA's claims in support of count I for breach of utmost duty of good faith. Summary judgment is therefore denied as to count IV to the extent consistent with this court's previous determinations concerning count I and the issues precluded by collateral estoppel.

## VII.   Count V - Damages for Promissory Estoppel/Promissory Fraud

In count V of the amended complaint, AXA asserts that to the extent that URC denies that

its agreement to file the Cash Flow Policy in Illinois and a revised Loss Payee Endorsement in Texas was a contractual obligation, URC is liable to AXA under the equitable doctrines of promissory estoppel or promissory fraud. URC argues that AXA fails to state a claim for promissory estoppel or promissory fraud because the New York Action already resolved the issue that AXA executed the Reinsurance Agreements knowing that they provided for Texas law and, as a consequence, AXA cannot claim any reliance on the pre-July 9, 1999 "promises." (URC 's Memorandum of Law In Support of Motion for Summary Judgment at P. 25). URC further maintains that AXA is prohibited from varying the terms of the Reinsurance Agreements by inadmissible parol evidence. *Id.*

As the court has explained, collateral estoppel does not preclude AXA from raising the issue that URC breached an independent agreement to file the amended Loss Payee Endorsement in Texas and to file the Loss Payee Endorsement and Cash Flow Policy providing for New York or Illinois law and jurisdiction with the Illinois DOI. In addition, the court has construed the oral promises and letters of July 7 and 8, 1999 as an independent agreement between AXA and URC, and, as a consequence, such evidence is not barred as parol evidence. Summary judgment is therefore denied as to Count V of the amended complaint.

## VIII. AXA's Damages

The parties further dispute whether AXA has suffered damages as a result of the alleged breach by URC of its various duties, contracts, and obligations. AXA seeks damages for the amount it had to pay Chase as a result of the New York Action, the premium it should have received, as well as legal fees and costs incurred in New York, Illinois, and Texas. While AXA does not specify with particularity the amount of legal fees and costs it incurred, it is undisputed that AXA did incur legal fees and costs in defending the various actions. Moreover, this court held that a genuine issue of

34

material fact exists as to whether URC tendered the correct amount of the premium for "The Crew" to AXA. As a consequence, genuine issues of material fact exist as to the amount, if any, of AXA's damages.

## IX.    Counterclaim I - Breach of Contract

In counterclaim I, URC asserts that AXA is liable for the damages[15] URC incurred beginning in October 1999 when AXA refused to accept its portion of the premium for "The Crew." AXA subsequently initiated the New York Action, which also forced URC to begin incurring expenses as a result of AXA's conduct. URC further asserts that the Credit, Security, Guarantee and Pledge Agreement of May 24, 1999, the Loss Payee Endorsement, the Form of Cash Flow Insurance (the Cash Flow Policy), and reinsurance slips constituted an integrated contract between Chase, AXA, URC, and the other reinsurers relating to the financing of "The Crew." Both parties agree that the Cash Flow Policy, Loss Payee Endorsement, and reinsurance slips are binding and enforceable contracts. *See* AXA RE's Memorandum of Law In Support of Its Motion for Summary Judgment on Underwriters Reinsurance Company's Counterclaim at P. 35; URC's Response to AXA RE's Motion for Summary Judgment on Underwriters Reinsurance Company's Counterclaims at PP. 17-18.

In the New York Action, Chase similarly contended that AXA anticipatorily breached the

---

[15]URC specifies the following expenses:

retaining outside counsel to protect its rights in the New York Litigation (dealing with document production, defending the depositions of employees and former employees, and protecting attorney-client privileged documents); defending itself against Chase's lawsuit in Texas; settling the lawsuits brought against it by Chase and others for amounts above and beyond its contractual obligations; and defending AXA's claim in the instant action."

(URC's Response To AXA RE's Motion for Summary Judgment On Underwriters Reinsurance Company's Counterclaims at P. 12).

Cash Flow Policy. *See* AXA App. Ex. 77 at P. 6. However, the New York court held that "under Texas law the complaint for declaratory judgment is insufficient as the predicate for a cause of action for anticipatory breach." (*Id.* at P. 7). The New York court continued:

> Here, the bringing of the action for declaratory judgment indicates not an unconditional refusal to comply with the obligations of the plaintiff, but an attempt to carry out those obligations. In effect, the plaintiff, by bringing the action says that it believes that under the relevant facts and law, it doesn't have certain obligations, but it asks the court to determine whether it's correct and whether its belief is based on a mistake or misunderstanding as to matters of fact and law. This is just an antithesis of the definition of anticipatory breach.

(*Id.* at P. 9). While URC would not have incurred any expenses had AXA not initiated the New York Action, the New York Action, as held by the New York court, was not an attempt by AXA to walk away from its contractual obligations. This court cannot imagine how the filing of the New York Action constitutes an anticipatory breach as to URC but not as to Chase.

Similarly, URC cannot assert an anticipatory breach against AXA as a result of AXA's refusal to accept its portion of the premium. As a general matter, "there can be no breach of contract until the time for performance has arrived. *Vise* v. *Foster*, 247 S.W.2d 274 at 280 (Tex. App. 1952). However, if a party expresses its intent to breach its portion of a contract, the non-breaching party may treat this as a breach and bring an action for damages. *Id.* The non-breaching party also may "treat the notice of intended breach as inoperative and await the time when the contract is to be performed, and then hold the other party responsible for all of the consequences of non-performance." *Id.* In the instant matter, URC did not file suit upon AXA's refusal to accept its portion of the premium, choosing instead to treat AXA's refusal to accept the premium as inoperative and to wait until the time payment on Chase's claim was due to assert its own claims

against AXA.

URC further asserts that AXA breached its contract when it refused Chase's demand for payment as of the Claim Payment Date, April 26, 2002. However, the Cash Flow Policy, by its terms, did not require payment on the Claim Payment Date. The Cash Flow Policy specifies:

> The Insurer shall make payment on the Claim Payment Date of the amount of the Ascertained Net Loss then due and payable. To the extent that such payment is not made on such Claim Payment Date, the amount thereof shall bear interest through the date of payment at the interest rate specified in the Loan Agreement before giving effect to any penalty interest provisions.

(AXA App. Ex. 1 at UR 002230). The Cash Flow Policy expressly contemplates that a payment may not be made on the Claim Payment Date and not constitute a breach of the Cash Flow Policy. As a consequence, AXA did not breach its contract by delaying payment to Chase while awaiting a determination as to the proper amount of Chase's claim.

Chase and AXA reached a global settlement in October 2003 that resolved AXA's liability to Chase on the Cash Flow Policy and Loss Payee Endorsement. (AXA App. Ex. 78 at ¶ 6). Under the valid and binding Loss Payee Endorsement, "[a]ny payment by Re-Insurer of its share of the claim hereunder to the Insured shall, to the extent of such payment, constitute a discharge of its obligations as Re-Insurer." (AXA App. Ex. 52 at UR002333). AXA has satisfied its obligations under the terms of the agreements, and, as a consequence, URC's counterclaim for breach of contract cannot withstand summary judgment because no breach occurred. Thus, summary judgment is granted as to counterclaim I. Summary judgment is also granted as to counterclaim II in light of URC's concession that it does not need to pursue its claim for promissory estoppel. *See* URC's Response to AXA RE's Motion for Summary Judgment on Underwriter's Reinsurance Company's Counterclaims at P. 18.

37

**XI.  Counterclaim III - Attorneys' Fees Pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code**

URC seeks attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code, which provides "A person may recover reasonable attorneys' fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: . . . (8) an oral or written contract." Tex. Civ. Prac. & Rem. Code § 38.001. In order to recover attorneys' fees under this section, "a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages." *Green Intl., Inc.* v. *Solis*, 951 S.W.2d 384, 390 (Tex. 1997)(*citing State Farm Life Ins. Co.* v. *Beaston*, 907 S.W.2d 430, 437 (Tex. 1995)). As established above, URC's claim for breach of contract fails to withstand summary judgment. URC, consequently, cannot prevail on a cause of action for which attorneys' recoverable. Summary judgment is therefore granted as to counterclaim III.

**ORDER**

For the reasons set forth above, URC's Motion for Summary Judgment is denied as to Counts I, III, IV, and V but granted as to Count II. AXA's Motion for Summary Judgment on Underwriters Reinsurance Company's Counterclaims is granted as to Counts I, II, and III.

Enter:  _Joan Humphrey Lefkow_ 
JOAN HUMPHREY LEFKOW
United States District Judge

Date: November 9, 2004